25 A.3d 1045 (2011)
207 N.J. 458
J.D., Plaintiff-Respondent,
v.
M.D.F., Defendant-Appellant.
No. 065499.
Supreme Court of New Jersey.
Argued January 19, 2011.
Decided July 28, 2011.
*1048 Anthony J. Balliette, Wildwood, argued the cause for appellant (Richard A. Renza, Jr., attorney).
J.D. argued the cause pro se.
Monica C. Gural argued the cause for amicus curiae Legal Services of New Jersey (Melville D. Miller, Jr., President, attorney; Ms. Gural, Mr. Miller, and Mary McManus-Smith, on the brief).
Justice HOENS delivered the opinion of the Court.
This appeal presents questions relating to the way in which proceedings brought pursuant to the Prevention of Domestic Violence Act (Act), N.J.S.A. 2C:25-17 to -35, are conducted.
First, we consider the due process implications that flow from permitting the putative victim to testify about alleged prior acts of domestic violence that were not identified in the complaint. More specifically, we consider how courts confronted with such proffers of testimony can, consistent with the goals of the Act, ensure that both parties are afforded the due process protections to which they are entitled.
Second, we address the parameters of due process to which defendants in domestic violence proceedings are entitled when they seek to call and to cross-examine witnesses.
Finally, we consider the kind and the quantum of evidence required to support issuance of a domestic violence restraining order which is based on the predicate act of harassment.

*1049 I.
From 1993 until 2006, plaintiff, J.D., and defendant, M.D.F., were engaged in a long-term relationship. Although they never married, they resided together and two children were born to them. After they ended their relationship, they sought the assistance of the courts in a variety of disputed proceedings, including a litigated palimony suit, the details of which are not apparent from the record on appeal in this matter. What is clear from the record is that following their separation, their relationship continued to deteriorate and they were on the verge of becoming embroiled in a custody dispute when the events that gave rise to this appeal occurred.
Throughout the proceedings relating to the domestic violence allegations in the trial court, the parties appeared without attorneys. As a result, the record has presented challenges to courts at every level. Relevant to this dispute, it appears that at all times since the end of the relationship, plaintiff continued to reside in the home that she and defendant had purchased together. The couple's two children resided with her, as did an older child of hers that she had from a relationship prior to the one with defendant. By the time of the events in issue, plaintiff had begun a relationship with a new person, R.T., who she referred to as her boyfriend, and who was present during the events in question.
Because defendant first asserts that his due process rights were violated, we recite the facts not in chronological order but as they were disclosed in the domestic violence complaint and as they unfolded at trial. Plaintiff's domestic violence complaint,[1] which was filed on September 19, 2008, was apparently compiled with the assistance of court personnel based on information plaintiff supplied and was transcribed on a court-approved form. According to the complaint, plaintiff and her boyfriend, R.T., observed defendant outside of plaintiff's residence at 1:42 a.m. taking flash photographs. In the complaint, plaintiff alleged that as soon as her boyfriend pulled aside the curtain to look, defendant drove away. According to the complaint, "[p]lain[tiff] reports def[endant] did this for the sole purpose of harassing plain[tiff] and attempting to cause strain in plain[tiff]'s present relationship."
The court-approved complaint form has a series of boxes identifying the numerous predicate offenses that can support issuance of a domestic violence restraining order, but on the complaint filed by plaintiff none of the boxes for a predicate act was checked off. The form also has a space for reciting prior or pending court proceedings between the parties. In that part of the form, plaintiff's September 2008 complaint identified two Family Division matters by docket number. The two docket numbers apparently relate to the palimony dispute and a custody and parenting time matter. The complaint also refers generally to "prior FVs" without further explanation.
In the section of the complaint form that requested identification of prior incidents of domestic violence, plaintiff referred to several. These were: (1) a June 2008 incident[2] in which defendant was outside *1050 of the residence taking pictures and asked her boyfriend "how the accommodations were"; (2) an undated incident[3] in which defendant climbed in her window and "attempted to have relations w[ith]" her; (3) an assertion that during "their separation def[endant] would come to the residence at various times"; and (4) an allegation that "[d]uring another occasion pla[intiff] had locked her doors and yet def[endant] was able to gain entry & harass" her.[4]
Based on that complaint, a Temporary Restraining Order (TRO) was issued and a return date was set for the following week. For reasons not apparent from the record, the matter was adjourned and a new return date fixed for a few days later. Plaintiff, accompanied by R.T., and defendant appeared on the adjourned return date.
After administering the oath to plaintiff and defendant, the trial court began to hear testimony from plaintiff about the basis of her complaint. Plaintiff briefly described the events that took place on September 19, explaining that her boyfriend, after emerging from the shower, went to hang a towel at the bedroom window. According to plaintiff, as R.T. was looking out of the window, he told her that he saw defendant outside taking pictures. Plaintiff further testified that she then "went to the window and [defendant] was in his white Dodge, outside the house and you could see flash photography. And hethen my boyfriend proceeded to pull the curtains back and [defendant] pulled away."
After that explanation of the basis for her request for a restraining order, the court inquired further of plaintiff, asking whether there was "[a]nything else you think I should know?" Plaintiff responded by referring to "multiple incidents," none of which had been identified in the complaint as being part of the prior history of domestic violence between the two. The prior incidents that were outside of the complaint have been referred to by the parties as the "videotape," the "lacrosse field," and the "Wawa" incidents. The "videotape" refers to an incident in which defendant left an embarrassing home videotape, created with plaintiff's knowledge and consent, in her mailbox with a message indicating that her new boyfriend should see it. The "lacrosse field" incident refers to a series of verbal arguments between the parties about parenting styles and about one child's missed practice sessions and included one dispute between defendant and R.T. about R.T.'s role in the lives of the children. The "Wawa" incident refers to a conversation between defendant and R.T. in a convenience store parking lot during which plaintiff was not present.
In describing those incidents, plaintiff recited the contents of text messages she asserted she had received and she reported the substance of conversations to which defendant and her boyfriend alone had been parties. She told the court that R.T. could corroborate her testimony if needed.
As plaintiff's testimony proceeded, the trial court repeated the earlier inquiry, asking "anything else you think I should know?" In response, plaintiff continued to add to her factual testimony, expanding it *1051 to include her views that the communications were "threats" and were "annoying" and offering her impression that the conversation between defendant and her boyfriend was defendant's effort to harass him as well.
When plaintiff concluded her series of responses to the trial court's repeated inquiries by saying, "that's basically it," the court offered defendant an opportunity to respond. Defendant immediately said that many of the incidents about which plaintiff had just testified had occurred long ago and asserted that he had not known that plaintiff would be referring to them. As part of that answer, defendant told the court that he "really wasn't prepared." Notwithstanding that, defendant attempted to respond and the court inquired in detail about several of those earlier incidents that had not been identified in the complaint.
After hearing defendant's responses to those questions, the trial court inquired about the early morning photography incident. Defendant did not immediately respond, attempting instead to discuss one of the other incidents that he believed would explain the reason for his decision to take photographs. Defendant then requested that plaintiff's boyfriend be sequestered and that he be given an opportunity to question R.T. about the photography incident. The court granted both requests.
Defendant did not deny that he had gone to plaintiff's residence and had taken photographs in the early morning hours, but his response concerning that incident was two-fold. In part, he sought to attack plaintiff's credibility by challenging her testimony that his car was parked while he was taking the photographs. He testified that he was driving slowly by, offering that as evidence in support of his testimony that he intended not to be detected.
Second, defendant attempted to suggest that he had an innocent motive for taking the photographs as proof that he did not intend to harass plaintiff. Although he was reluctant to reveal his motive, it was apparent that defendant had been preparing to file, and on the same day when he was served with the TRO he had filed, a motion seeking to challenge plaintiff's custody of their two children. It was readily apparent from his testimony that he was taking late-night photographs of R.T.'s truck parked outside the home because defendant hoped that gathering photographic evidence that plaintiff's boyfriend was residing there would assist him in his quest to have custody of the two minor children transferred to him. He testified that, in light of the custody dispute, he wanted to take the photographs without being detected and that plaintiff's domestic violence complaint was her effort to gain the upper hand in that separate litigation. He explained that because plaintiff's oldest daughter had been at his residence with the couple's two children at a time when his draft complaint for custody was spread out on his kitchen table, he surmised that plaintiff had learned of his plan and filed the domestic violence complaint as a preemptive strike.
The trial court then permitted defendant to inquire of plaintiff briefly. Defendant used that opportunity to try to undercut plaintiff's credibility by focusing on whether he was parked or not. After a time, the trial court concluded that both that line of attack, as well as defendant's assertion that he was only taking photographs for his custody motion and his suggestion that plaintiff was aware of his motive, were irrelevant.
Once the trial court decided that the basis for defendant's credibility challenge was meritless, and without permitting defendant to question plaintiff's boyfriend, *1052 the court granted a Final Restraining Order (FRO). In doing so, the court found as follows:
Sir, I've heard enough. You concede to being out there taking pictures and even assuming that it's to build your case to modify the existing order or to modify the custody order, given the history, specifically the videotape, the incident at the lacrosse field, the incident at the Wawanumber one, in and of itself, you being out there, sir, quarter of two in the morning, in my view, qualifies, in and of itself, as harassment. Even assuming that you were trying to build your case, it could not have any other effect but to annoy or alarm [plaintiff]. And especially in light of the prior history, the videotape, which was, at the very least, a dirty trick, sir. And quite frankly, I want to make a comment on your presentation here today. It's notit just doesn't seem, quite frankly, to be coherent in the sense that you're thinking clearly, sir.... Your theory of the case that she somehow knew that you were going to file a custody motion because your stepdaughter had been there, it's simplythose are dots that you can't connect and you concede to being out there at a quarter of two in the morning taking pictures. And that's harassment, sir, regardless of whether you were parked or not.
Defendant pursued an appeal to the Appellate Division. He argued that the trial court erred by: (1) permitting testimony about facts not included in the complaint; (2) incorrectly finding that plaintiff had proven the predicate offense of harassment; (3) denying defendant the right to present his case and defend himself in a full hearing; (4) failing to create a full and complete record for appellate review; and (5) using an improper standard for plaintiff's burden of proof.
In an unpublished opinion, the Appellate Division affirmed. The panel concluded that the trial court properly found that defendant had harassed plaintiff within the meaning of the applicable statute, see N.J.S.A. 2C:33-4c, and that the testimony about prior incidents that were not contained in the complaint was properly admitted. The appellate panel also rejected defendant's assertion that he had been deprived of a full opportunity to present his case and to question the relevant witnesses. In addition, the panel determined that the trial court sufficiently explained its reasons for issuing the FRO and rejected defendant's argument that the trial court used an incorrect burden of proof. Finally, responding to defendant's argument that he could not have been harassing plaintiff because he was found not guilty of harassment in a subsequent Municipal Court proceeding, the panel pointed out that because of the enhanced burden of proof required in that separate setting, it was not relevant to the domestic violence proceeding.
Defendant filed a petition for certification[5] which we granted. 203 N.J. 96, 999 A.2d 464 (2010). We thereafter granted leave to Legal Services of New Jersey to participate in the appeal as an amicus curiae.

II.
Defendant's petition for certification raises questions concerning the due process implications of permitting proffers of evidence of alleged prior incidents of domestic violence that were not identified in *1053 plaintiff's complaint and the nature and quantum of proof required to support a finding of intent to harass. He argues that permitting plaintiff to testify about numerous past events that she alleged were instances of domestic violence but that were not so identified in her complaint deprived him of sufficient notice to comport with due process. Further, he contends that the trial court separately deprived him of due process by precluding him from cross-examining plaintiff's boyfriend, whose testimony he asserts would have bolstered his defense that he lacked the intent to harass and would have impeached plaintiff's credibility. He argues that the facts before the trial court were insufficient to demonstrate that he acted with the requisite statutory intent to harass. Finally, he contends that his subsequent acquittal of the harassment charge in Municipal Court demonstrates that he lacked the intent to harass and makes clear that the trial court erred.
Plaintiff, relying on her appellate brief, urges this Court to affirm. In essence, she asserts that all of the earlier incidents about which she testified were events concerning which defendant had first-hand knowledge, therefore undercutting any adverse impact that might otherwise arise from the lack of notice. Moreover, she argues that there was ample evidentiary support for the trial court's finding that defendant acted with the intent to harass her.[6]
Amicus Legal Services of New Jersey urges this Court to affirm the judgment of the Appellate Division. It argues that there is adequate evidence in the record to support the finding of intent to harass and contends that any evidence of an alternate non-harassing purpose cannot undercut that finding. At the same time, it asks us to clarify the appropriate procedures to be followed when a plaintiff in a domestic violence proceeding offers testimony that expands on the matters revealed in the complaint.

III.
New Jersey's Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, sets forth the Legislature's purpose and intention in broad and unmistakable language:
The Legislature finds and declares that domestic violence is a serious crime against society; that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence.
[N.J.S.A. 2C:25-18.]
We have echoed the breadth of the Legislature's expressed intent by observing that "[o]ur law is particularly solicitous of victims of domestic violence." State v. Hoffman, 149 N.J. 564, 584, 695 A.2d 236 (1997). As we have noted, "there is no such thing as an act of domestic violence that is not serious." Brennan v. Orban, *1054 145 N.J. 282, 298, 678 A.2d 667 (1996). Initially enacted in 1991, the Act has been amended on several occasions, to increase the scope of those who fall within its protective sweep, see L. 1994, c. 93, § 2 (expanding categories of victim to include those in dating relationships), to add to the permissible grounds for relief, see L. 1994, c. 94, § 2 (expanding categories of victim to include those anticipating a child in common and adding stalking as predicate offense), to expand protections, see, e.g., L. 2003, c. 277, § 1 (requiring inquiry about weapons), and to ensure adequate training and education for those charged with enforcing the Act, see L. 1999, c. 289, § 1 (requiring that all judges, judicial personnel and law enforcement officers attend annual in-service training and adopting minimum time requirements for law enforcement officers' annual in-service training).
The Act defines domestic violence by referring to a list of predicate acts that are otherwise found within the New Jersey Code of Criminal Justice. See N.J.S.A. 2C:25-19a. It provides that the commission of a predicate act, if the plaintiff meets the definition of a "victim of domestic violence," N.J.S.A. 2C:25-19d, constitutes domestic violence and authorizes the court to impose restraints, N.J.S.A. 2C:25-26, and related forms of relief, N.J.S.A. 2C:25-29b.
Although committing one of the predicate acts may also expose the offender to criminal prosecution, see N.J.S.A. 2C:25-27, the Act did not create a new class of criminal offenses, see Kamen v. Egan, 322 N.J.Super. 222, 227, 730 A.2d 873 (App.Div.1999); In re M.D.Z., 286 N.J.Super. 82, 86-87, 668 A.2d 423 (App. Div.1995). Unlike a criminal prosecution, in which the State's burden of proof is the familiar beyond a reasonable doubt standard, the Prevention of Domestic Violence Act tests a victim's entitlement to relief in accordance with the preponderance of the evidence standard, consistent with the lowered burden of proof appropriate in a civil proceeding. See Crespo v. Crespo, 408 N.J.Super. 25, 32-34, 972 A.2d 1169 (App. Div.2009) (concluding that because restraints are essentially civil in nature, preponderance of evidence standard is applicable), aff'd o.b., 201 N.J. 207, 989 A.2d 827 (2010). By extension, because of the difference in the burden of proof, a judgment of acquittal of the predicate act will not undercut the court's authority to impose restraints or other relief permitted by the Act.
Although the restraints imposed pursuant to the Act are essentially civil, they are backed by the threat of enforcement through a contempt proceeding, N.J.S.A. 2C:25-30, and are accompanied by the possibility of the imposition of criminal sanctions, N.J.S.A. 2C:25-31 (authorizing arrest if law enforcement officer finds probable cause to believe defendant has committed act of contempt); N.J.S.A. 2C:29-9b (defining contempt to include violation of order entered pursuant to Prevention of Domestic Violence Act).
Sadly, in spite of decades of careful and consistent enforcement of the Act by our courts, domestic violence remains a significant problem in our society. In 2009, the most recent year for which statistics were available for inclusion in the statutorily mandated annual report, see N.J.S.A. 2C:25-24, reports of domestic violence offenses had increased. See Office of Attorney General, Domestic Violence in New Jersey: For the Year Ending December 31, 2009, at 1 (2010) [hereinafter Domestic Violence in New Jersey]. Although a year-by-year comparison for the period from 2005 though 2009 demonstrates that there had been a slight downward trend in domestic violence incidents *1055 through 2008, that trend was reversed for the most recent reporting year, with total reported incidents in most categories exceeding most prior years. Id. at 3.
Among the predicate offenses that may serve as the basis for domestic violence purposes, see N.J.S.A. 2C:25-19, one of the most frequently reported is harassment, N.J.S.A. 2C:33-4; see Domestic Violence in New Jersey, supra, at 3. In 2009, harassment was not only the most frequently reported of all predicate offenses, but it exceeded its incidence as compared to all prior reporting years. Domestic Violence in New Jersey, supra, at 3. At the same time, however, harassment is the predicate offense that presents the greatest challenges to our courts as they strive to apply the underlying criminal statute that defines the offense to the realm of domestic discord. Drawing the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of "ordinary domestic contretemps," Corrente v. Corrente, 281 N.J.Super. 243, 249-50, 657 A.2d 440 (App.Div.1995), presents our courts with a weighty responsibility and confounds our ability to fix clear rules of application.
In part, the decision about which acts constitute domestic violence and which do not can be found not in the analysis of the predicate acts themselves, but in the second inquiry required of courts considering complaints seeking protection pursuant to the Act. Our Appellate Division has ably explained the appropriate approach:
The second inquiry, upon a finding of the commission of a predicate act of domestic violence, is whether the court should enter a restraining order that provides protection for the victim.
. . .
This second inquiry, therefore, begins after the plaintiff has established by a preponderance of the evidence, the commission of one of the enumerated predicate acts "upon a person protected under this act by an adult or an emancipated minor[.]" N.J.S.A. 2C:25-19a. Although this second determination whether a domestic violence restraining order should be issuedis most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the facts set forth in N.J.S.A. 2C:25-29a(1) to -29a(6), to protect the victim from an immediate danger or to prevent further abuse. See N.J.S.A. 2C:25-29b (stating that "[i]n proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse") (Emphasis added).
[Silver v. Silver, 387 N.J.Super. 112, 126-27, 903 A.2d 446 (App.Div.2006).]
Although evidence offered by a putative victim may therefore suffice to meet the definition of harassment, courts must be careful not to overlook the statutory requirement that there be a finding that "relief is necessary to prevent further abuse." N.J.S.A. 2C:25-29b. Merely concluding that plaintiff has described acts that qualify as harassment and omitting this added inquiry opens the door to potential abuse of the important purposes that the Act is designed to serve and threatens to "trivialize the plight of true victims," Corrente, supra, 281 N.J.Super. at 250, 657 A.2d 440, in the process.
The record before the Court in this appeal demonstrates all of the challenges that our trial courts confront daily as they seek to be faithful to the Legislature's intent as expressed in the Act, while being vigilant lest they become pawns in an ongoing struggle between the parties seeking an advantage in another forum.

*1056 IV.
Defendant's petition for certification raises two distinct kinds of questions. The first concerns his due process right to notice and to a fair opportunity to defend himself against plaintiff's claims. The second relates to the sufficiency of the proofs on which the trial court relied in entering restraints against him.

A.
Because all of the arguments raised on appeal rest only on a claimed act of harassment, we begin with a review of the body of law that has developed concerning this most challenging basis for a domestic violence complaint. The predicate act of harassment is defined by statute to be a criminal offense:
Harassment. Except as provided in subsection e., a person commits a petty disorderly persons offense if, with purpose to harass another, he:
a. Makes, or cause to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
b. Subjects another to striking, kicking, shoving or other offensive touching, or threatens to do so; or
c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
A communication under subsection a. may be deemed to have been made either at the place where it originated or at the place where it was received.
[N.J.S.A. 2C:33-4 (omitting deleted and grading subsections).]
We have considered harassment in the domestic violence context previously. As we explained, there are two separate subparts of the harassment statute, each of which requires a different analysis based on the facts alleged. Hoffman, supra, 149 N.J. at 576, 695 A.2d 236 (reiterating language that described subsections as "free-standing, because each defined an offense in its own right") (quoting State v. Mortimer, 135 N.J. 517, 525, 641 A.2d 257 (1994)).
The analysis of an allegation that defendant has violated N.J.S.A. 2C:33-4a (subsection a.) begins with a communication that has been made anonymously, at an extremely inconvenient hour, in coarse or offensive language, or in a similar fashion. For purposes of subsection a., there need only be proof of a single such communication, as long as defendant's purpose in making it, or causing it to be made by another, was to harass and as long as it was made in a manner likely to cause annoyance or alarm to the intended recipient. In explaining the standard applicable to subsection a., we have concluded that "[a] finding of a purpose to harass may be inferred from the evidence presented," and we have observed that "[c]ommon sense and experience may inform that determination." Id. at 577, 695 A.2d 236. The harassment statute defines the violation in terms of annoyance or alarm, and we have held that for purposes of subsection a., "[a]nnoyance means to disturb, irritate, or bother." Id. at 580, 695 A.2d 236.
A violation of N.J.S.A. 2C:33-4c (subsection c.), by contrast, requires proof of a course of conduct. That may consist of conduct that is alarming or it may be a series of repeated acts if done with the purpose "to alarm or seriously annoy" the intended victim. In interpreting subsection c., which refers to "serious" annoyance or alarm, this Court has explained that the phrase means "to weary, worry, trouble or offend." Id. at 581, 695 A.2d 236.

*1057 B.
We begin our analysis with defendant's assertions that his due process rights were violated when plaintiff was permitted to expand upon the information included in the complaint and when defendant was deprived of the opportunity to question R.T. about the events that formed the basis for the entry of restraints.
Defendant's argument that permitting plaintiff to testify about numerous incidents she asserted were evidence of a prior history of domestic violence, but that were not identified in her complaint, violated his due process rights is a variation of an argument that we have previously addressed. As we have held, ordinary due process protections apply in the domestic violence context, notwithstanding the shortened time frames for conducting a final hearing, see N.J.S.A. 2C:25-29a, that are imposed by the statute, see H.E.S. v. J.C.S., 175 N.J. 309, 321-23, 815 A.2d 405 (2003). What that means is that "[a]t a minimum, due process requires that a party in a judicial hearing receive `notice defining the issues and an adequate opportunity to prepare and respond.'" Id. at 321, 815 A.2d 405 (quoting McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 559, 626 A.2d 425 (1993)). More particularly, we held that due process forbids the trial court "`to convert a hearing on a complaint alleging one act of domestic violence into a hearing on other acts of domestic violence which are not even alleged in the complaint.'" Id. at 322, 815 A.2d 405 (quoting J.F. v. B.K., 308 N.J.Super. 387, 391-92, 706 A.2d 203 (App.Div.1998)); see L.D. v. W.D., 327 N.J.Super. 1, 4, 742 A.2d 588 (App.Div.1999) (explaining that "it is clearly improper to base a finding of domestic violence upon acts or a course of conduct not even mentioned in the complaint.").
The fact remains, however, that plaintiffs seeking protection under the Act often file complaints that reveal limited information about the prior history between the parties, only to expand upon that history of prior disputes when appearing in open court. And it is frequently the case that the trial court will attempt to elicit a fuller picture of the circumstances either to comply with the statutory command to consider the previous history, if any, of domestic violence between the parties, see N.J.S.A. 2C:25-29a(1), or to be certain of the relevant facts that may give content to otherwise ambiguous communications or behavior, see H.E.S., supra, 175 N.J. at 327, 815 A.2d 405 (commenting that "parties' past history, when properly presented, helps to inform the court regarding defendant's purpose, motive and intended use of information obtained through the video and audio surveillance of plaintiff's private acts"); Cesare v. Cesare, 154 N.J. 394, 402, 713 A.2d 390 (1998) (observing that Act requires court to consider prior history, if any, of domestic violence).
That reality is not inconsistent with affording defendants the protections of due process to which they are entitled. Instead, ensuring that defendants are not deprived of their due process rights requires our trial courts to recognize both what those rights are and how they can be protected consistent with the protective goals of the Act. To begin with, trial courts should use the allegations set forth in the complaint to guide their questioning of plaintiffs, avoiding the sort of questions that induced plaintiff in this appeal to abandon the history revealed in the complaint in favor of entirely new accusations. That does not mean that trial courts must limit plaintiffs to the precise prior history revealed in a complaint, because the testimony might reveal that there are additional prior events that are significant to the *1058 court's evaluation, particularly if the events are ambiguous. Rather, the court must recognize that if it allows that history to be expanded, it has permitted an amendment to the complaint and must proceed accordingly.
To be sure, some defendants will know full well the history that plaintiff recites and some parties will be well-prepared regardless of whether the testimony technically expands upon the allegations of the complaint. Others, however, will not, and in all cases the trial court must ensure that defendant is afforded an adequate opportunity to be apprised of those allegations and to prepare. See H.E.S., supra, 175 N.J. at 324, 815 A.2d 405 (concluding that allowing defendant only twenty-four hours to prepare violates due process).
When permitting plaintiff to expand upon the alleged prior incidents and thereby allowing an amendment to the complaint, the court also should have recognized the due process implication of defendant's suggestion that he was unprepared to defend himself. Although defendant's assertion that he needed time to prepare was not cloaked in the lawyer-like language of an adjournment request and was made as part of a longer response to a question, it was sufficient to raise the due process question for the trial court and it should have been granted. Our courts have broad discretion to reject a request for an adjournment that is ill founded or designed only to create delay, but they should liberally grant one that is based on an expansion of factual assertions that form the heart of the complaint for relief.
This is especially true because there is no risk to plaintiff based on such a procedure; courts are empowered to continue temporary restraints during the pendency of an adjournment, thus fully protecting the putative victim while ensuring that defendant's due process rights are safeguarded as well. See Domestic Violence Procedures Manual § 4.12 (2004) (authorizing amendment to complaint and continuation of temporary restraints during period of adjournment).
Defendant has raised a second due process concern arising out of his request for an opportunity to question R.T. about his recollection of the facts that formed the basis for plaintiff's complaint. Defendant explained that he believed R.T.'s testimony would help his defense in two ways. He expected to demonstrate that he left as soon as he was detected, which would rebut the implication that his purpose was to harass plaintiff. Moreover, he intended to elicit facts that would be different from those sworn to by plaintiff, thus undercutting plaintiff's credibility. The trial court, although granting defendant's application for R.T. to be sequestered and promising defendant that he would be able to question him, later decided that plaintiff's proofs sufficed and that defendant's proposed areas of questioning of R.T. would not alter the outcome.
In similar circumstances, our Appellate Division has held that denying defendant the opportunity to cross-examine witnesses or to present witnesses violates due process. Peterson v. Peterson, 374 N.J.Super. 116, 124-26, 863 A.2d 1059 (App.Div.2005). We reach that conclusion on this record as well. Many litigants who come before our courts in domestic violence proceedings are unrepresented by counsel; many are unfamiliar with the courts and with their rights. Sifting through their testimony requires a high degree of patience and care. The pressures of heavy calendars and volatile proceedings may impede the court's willingness to afford much leeway to a party whose testimony may seem disjointed or *1059 irrelevant. But the rights of the parties to a full and fair hearing are paramount.
This record demonstrates that defendant, who never denied that he was there and was taking photographs, hoped to show that his act was entirely innocent and that it was not something he wanted plaintiff to know about. In his effort to prove that, he wanted to explain that he did not even stop his car and he believed that R.T. would so testify. Even if he had failed at that effort, he thought that the different recollections between plaintiff and R.T. as to his location when they looked out of the window would undercut plaintiff's credibility and benefit him. Denying him the opportunity to explore that theory, however briefly was a mistaken exercise of discretion that had the unfortunate effect of depriving defendant of due process.
We do not suggest that our trial courts are without means to control testimony or to require that parties present testimony and evidence relevant to the issues in dispute. Nor do we mean to make our trial courts prisoners of the whims of litigants locked in domestic warfare. But their obligation is to see to it that justice is accomplished and to conduct and control proceedings in a manner that will best serve that goal.

C.
Defendant's final argument relates to the sufficiency of the evidence on which the trial court relied in concluding that he had committed the predicate act of harassment and that plaintiff therefore was entitled to protection under the Act. Our courts have struggled with the proofs needed to support a domestic violence restraining order based on claims of harassment. In part, the challenge comes from litigants, often representing themselves, who use the word "harassment" as it is used in common parlance rather than in the sense meant by either the New Jersey Code of Criminal Justice or the Prevention of Domestic Violence Act. Often, a party's accusation that another's actions are "harassing" is vague and conclusory, making it particularly difficult for a trial court to discern on which side of the line running between domestic violence and ordinary "contretemps" a particular act properly falls.
In our efforts to be faithful to the strong expressions of our Legislature and to protect the rights of both parties we have vested great discretion in our Family Part judges. See Cesare, supra, 154 N.J. at 412-13, 713 A.2d 390. We have observed that they are judges who have been specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples, and we have recognized that their findings are entitled to deference. Ibid.
Many published decisions have addressed questions concerning what conduct constitutes harassment and what does not. Our Appellate Division has concluded that sending explicit photographs of plaintiff to her sister and threatening to send them to plaintiff's son and to her workplace was harassment. McGowan v. O'Rourke, 391 N.J.Super. 502, 506, 918 A.2d 716 (App. Div.2007). Similarly, there was sufficient evidence to support a finding of harassment when defendant found plaintiff's new telephone number and sent her a text message that told her that he could see her watching a particular television show. Pazienza v. Camarata, 381 N.J.Super. 173, 183-84, 885 A.2d 455 (App.Div.2005). Even though defendant was not in fact watching plaintiff and therefore was unable to see her, the content of the message was such that it was intended to cause her "annoyance, which means `to disturb, irritate, or bother.'" Id. at 184, 885 A.2d 455 *1060 (quoting Hoffman, supra, 149 N.J. at 580, 695 A.2d 236).
A history of domestic violence may serve to give content to otherwise ambiguous behavior and support entry of a restraining order. For example, in part based on the parties' history, a defendant who was angry because plaintiff rebuffed his efforts to talk to her, and who blocked her from leaving in her car, using coarse and vulgar language to express his frustration, committed an act of harassment. Tribuzio v. Roder, 356 N.J.Super. 590, 598, 813 A.2d 1210 (App.Div.2003).
Not all offensive or bothersome behavior, however, constitutes harassment. In the criminal context, our Appellate Division has cautioned against "overextending a criminal statute to rude behavior which is not directed to anyone specifically but only towards an institution in general." State v. Duncan, 376 N.J.Super. 253, 263-64, 870 A.2d 307 (App.Div.2005). That observation convinced the appellate panel that "venting of frustration or irritation" and using obscenities during a 911 call did not demonstrate a purpose to harass, thus making a restraining order inappropriate. Id. at 262-64, 870 A.2d 307 (noting that purposeful "is the highest form of mens rea contained in our penal code, and the most difficult to establish").
There are numerous other examples of acts that our courts have concluded do not, without more, constitute harassment. See, e.g., L.D., supra, 327 N.J.Super. at 3-4, 742 A.2d 588 (concluding that calling plaintiff at her place of employment to advise that defendant had moved her desk and had taken children to counseling rather than to choir practice did not constitute harassment); J.F., supra, 308 N.J.Super. at 391, 706 A.2d 203 (concluding that merely leaving non-threatening note on plaintiff's windshield was not harassment).
Nor are a plaintiff's mere assertions that the conduct is harassing sufficient. See Chernesky v. Fedorczyk, 346 N.J.Super. 34, 40, 786 A.2d 881 (App.Div. 2001) (concluding that telephone calls and visits to plaintiff's property alone did not rise to level of harassment). Rather, particularly when addressing claims of harassment, it is the obligation of our courts to consider the testimony and weigh the allegations as against the statutory standards and the rich body of our case law. To be sure, the decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive. The smallest additional fact or the slightest alteration in context, particularly if based on a history between the parties, may move what otherwise would appear to be non-harassing conduct into the category of actions that qualify for issuance of a restraining order.
With these principles and these examples of their application to guide us, we turn to a consideration of whether the facts in the record support the court's finding that defendant committed an act or a series of acts of harassment sufficient to entitle plaintiff to issuance of a domestic violence restraining order. Our analysis must begin by restating the findings that the trial court made. Boiled down to its essence, the court first noted that the critical facts were not contested, because defendant conceded that he had been outside of the residence early in the morning taking photographs. Based on that alone, the trial court concluded that "being there... at quarter to two in the morning .. in and of itself, [is] harassment." Supplementing that finding, however, the court relied on three incidents about which plaintiff had testified, none of which had been identified in the complaint. Finally, the court rejected defendant's repeated assurances that his purpose was only to *1061 gather evidence for his planned custody motion, concluding instead that he acted with the requisite purpose to harass.
The trial court did not specify which of the two subsections of the harassment statute it was applying to the factual assertions being raised by plaintiff. Although the appellate panel applied subsection c., because the trial court's recitation of findings and conclusions appears to be an alternative analysis that might have been intended to support issuance of the restraining order pursuant to either subsection, we consider each separately.
It is possible that the court meant to apply subsection a., based on the reference to the fact that defendant's presence outside the residence alone sufficed. For purposes of subsection a., a single act can be enough and the act, given that it took place at what could clearly qualify as an "extremely inconvenient hour," N.J.S.A. 2C:33-4a, could theoretically constitute a predicate act. Nevertheless, it would only qualify as a predicate act if it were both committed with a purpose to harass and if the act was "likely to cause annoyance or alarm." Ibid.
The evidence in this record, however, is insufficient to support a finding under subsection a. Merely being outside of the home in the early morning hours is not an act of harassment. More to the point, plaintiff's own clear testimony about the incident demonstrates that she was completely unaware that defendant was outside until R.T. walked over to the window and happened to look out. Only then did he notice defendant taking photographs and tell plaintiff what he saw. Plaintiff also conceded that as R.T. pulled aside the curtain, defendant immediately left. Far from a record suggesting that defendant's camera created a series of bright flashes that drew plaintiff's attention and caused her alarm, the undisputed facts are that plaintiff saw nothing until R.T. called to her and that defendant beat a hasty retreat when the curtain moved and he realized that they had seen him.
In the alternative, as the appellate panel surmised, the trial court might have meant to apply subsection c. That test for harassment would require a course of alarming conduct or a series of repeated acts, along with proof of a purpose to alarm or seriously annoy plaintiff. N.J.S.A. 2C:33-4c. Utilizing the test set forth in subsection c., there is no evidence of a repeated act, with the result that defendant can only be in violation of subsection c. if he engaged in a "course of alarming conduct" within the meaning of the statute.
The trial court did not articulate precise findings of fact and conclusions of law and therefore did not explain what it was in the series of past incidents that led it to conclude that defendant's purpose when he engaged in late-night photography was to harass plaintiff. Certainly, the series of events that plaintiff testified were part of the history between the parties shows that defendant's behavior was hardly praiseworthy. But those events may or may not suffice to demonstrate defendant's intent and absent the trial court's explanation of its reasoning or its analysis, we cannot be confident that they do.
First, the statute requires that the victim, in this instance, the plaintiff, be the target of the harassing intent. Many of the incidents set forth by plaintiff in this record, including defendant's snide remarks to the new beau about the comfort of the accommodations, are ones in which plaintiff was not even present. Those incidents, therefore, could not serve as evidence of an intent to annoy or alarm plaintiff. See D.C. v. T.H., 269 N.J.Super. 458, 458-62, 635 A.2d 1002 (App.Div.1994) (concluding that defendant who made threatening *1062 remarks towards the boyfriend of his child's mother but not directed to her personally did not commit act of domestic violence). Moreover, there is nothing in those acts that objectively rises to the level of "alarming" or "seriously annoying" as the statute demands.
Turning to the other past incidents, the trial court placed particular emphasis on defendant's delivery of the videotape to plaintiff. Although referring to it as "a dirty trick," the trial court did not explain how it demonstrated that defendant acted with the purpose to harass plaintiff when he went to take photographs, which is the incident claimed to be the predicate act. Although a purpose to harass can be inferred from a history between the parties, see Hoffman, supra, 149 N.J. at 577, 695 A.2d 236, that finding must be supported by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient. State v. Fuchs, 230 N.J.Super. 420, 428, 553 A.2d 853 (App.Div.1989) (reversing criminal conviction for harassment). The victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose. See State v. Washington, 319 N.J.Super. 681, 691-92, 726 A.2d 326 (Law Div.1998). Moreover, when evaluating whether an individual acted with the requisite purpose, our courts must be especially vigilant in cases involving, as do many domestic violence disputes, the interactions of a couple in the midst of a breakup of a relationship. See Franklin v. Sloskey, 385 N.J.Super. 534, 544, 897 A.2d 1113 (App.Div.2006) (concluding that evidence established only a "dispute between a couple in the midst of a breakup, disagreeing over the future of their unborn child" rather than intent to harass); Bresocnik v. Gallegos, 367 N.J.Super. 178, 842 A.2d 276 (App.Div.2004) (concluding that letter expressing regret and continued affection did not reveal intent to harass).
It is significant as well that defendant in fact was preparing a motion for a change in custody that was based on plaintiff's cohabitation and the effect he believed that her new relationship was having on his children. That motion, which defendant testified was the reason for his decision to go to the home and take photographs, was filed within hours of the event, and its implications should have been considered and addressed by the court. We do not imply that, in evaluating claims of domestic violence, an individual can have only one motive or intent. On the contrary, domestic violence often presents circumstances in which a party may mask an intent to harass with what could otherwise be an innocent act. But some domestic violence complainants may perceive an entirely innocent act to be a harassing one as well. Our courts must examine the record with care lest an abuser hiding behind an apparently innocent act be overlooked. But they must be equally careful lest a plaintiff be permitted to seize upon what is truly an innocent act in an effort to gain an advantage in litigation between parties.
Finally, although not directly raised by defendant, the record does not include an analysis of "the second inquiry," see Silver, supra, 387 N.J.Super. at 126-27, 903 A.2d 446, and thus lacks the required consideration of whether entry of restraints is "necessary" to protect plaintiff from harm. N.J.S.A. 2C:25-29. That inquiry serves to ensure that the protective purposes of the Act are served, while limiting the possibility that the Act, or the courts, will become inappropriate weapons in domestic warfare. Although, as our Appellate Division noted, there will be cases in which the risk of harm is so great that the inquiry can be perfunctory, in others, including this one, it is not. In those cases, overlooking that *1063 important step in the analysis poses the risk of unfairness and error.
In entering the FRO, the trial court did not sufficiently articulate findings and conclusions consistent with the statutory standards and our independent review of the record leaves us unsure that there is sufficient evidence to sustain the issuance of the order. Therefore, in an abundance of caution, and mindful of the Family Court's "special expertise" and the Act's protective purposes, we are constrained to remand this matter to the trial court for a re-hearing, both to protect defendant's due process rights and to permit the trial court to evaluate the testimony and the evidence in accordance with the principles we have expressed.

V.
The judgment of the Appellate Division is reversed and the matter is remanded to the trial court for further proceedings.
For reversal and remandmentChief Justice RABNER and Justices LONG LaVECCHIA, ALBIN, RIVERA-SOTO, HOENS6.
OpposedNone.
NOTES
[1] The September 19, 2008 complaint was not plaintiff's first domestic violence complaint. The record reveals that in June 2008 she filed a complaint based on what she described as a series of incidents that had begun in January 2008. That complaint was considered by a Superior Court Judge who denied plaintiff's application for temporary restraints. As a result, it was not served on defendant and the record does not suggest that he was aware of those allegations or of the existence of that complaint.
[2] This refers to a dispute solely between defendant and R.T. and was an argument between them as to which R.T. declined to pursue any form of relief. It was not among the incidents that plaintiff set forth in her June 2008 domestic violence complaint.
[3] This incident, according to the June 2008 complaint, occurred in "summer 2007" at which time defendant "begged" plaintiff to engage in relations with him.
[4] The recitation of these events exceeded the space allotted on the form and continued onto a subsequent page of the form as an addendum.
[5] Defendant was represented on appeal and his appellate attorney filed his petition for certification and presented oral argument before this Court. Plaintiff appeared at the Appellate Division and before this Court without counsel.
[6] Following oral argument, the parties have continued to send materials to this Court in an apparent effort to further bolster their positions. Those submissions, none of which was accompanied by a motion seeking leave to supplement the record, see R. 2:12-6 (defining record on appeal by way of petition for certification); R. 2:12-11 (limiting proceedings following grant of petition for certification), have not been considered by the Court.