# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2957-22

T.S.,

    Plaintiff-Respondent,

v.

R.S.,

    Defendant-Appellant.

---

Submitted October 30, 2024 – Decided January 7, 2025

Before Judges Marczyk and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-1060-23.

Robert Carter Pierce, attorney for appellant (Jeff Thakker, of counsel; Robert Carter Pierce, on the briefs).

Harriet E. Raghnal, attorney for respondent.

PER CURIAM

Defendant R.S.[1] appeals from the April 19, 2023 final restraining order (FRO) entered against him and in favor of plaintiff T.S. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Based on our review of the record and applicable legal principles, we affirm.

I.

The parties had a long, tumultuous relationship and were going through a divorce at the time of the FRO hearing. They began dating in the mid-1990s and married in 2007. In 1996, defendant had relationships with both plaintiff and her sister at the same time, but he testified he "didn't know they were sisters." Defendant testified his relationship with plaintiff was "rocky because . . . [he] had a baby with her sister" in 2005.

Later in 2005, defendant and plaintiff moved in together. Plaintiff became pregnant with defendant's son, Tom, who was born in 2006. Plaintiff testified "being in a relationship with [defendant] was hard," and he called her

---

[1] We utilize initials and pseudonyms to protect the confidentiality of the parties, their children, and other relatives. R. 1:38-3(d)(9).

A-2957-22

disparaging names throughout their relationship, causing her to undergo gastric bypass surgery.[2]

Plaintiff had other children including Amy, who was born in 2001 from a different relationship. Plaintiff had a very strained relationship with Amy because she believed Amy was having an inappropriate relationship with defendant, her stepfather. In 2019, plaintiff observed Amy and defendant lying in bed together with Amy's infant son. Plaintiff went on social media "to talk about the fact that [she] saw them in the bed together." Thereafter, Amy and her infant son relocated to a homeless shelter after plaintiff kicked them out of the house.

Amy and plaintiff's long-standing antipathy was also evident in April 2020, while plaintiff and defendant were leasing a Newark home together. At that time, plaintiff was allegedly cheating on defendant. Amy had the password to plaintiff's phone and was able to access plaintiff's social media. In plaintiff's social media accounts, Amy found evidence of plaintiff's infidelity, which she shared with defendant. Defendant, in turn, became angry and sent plaintiff "a

---

[2] Plaintiff testified he repeatedly called her names, such as "fat b[***]h[]" and "fat a[**]," which led her to undergo the weight loss procedure. After multiple procedures, including "a breast reduction," "arm lift," and a "tummy tuck," defendant began to call plaintiff "cut up fat b[***]h."

A-2957-22

whole bunch of texts" letting her know that he was aware of her affair. The messages persisted for three days, and plaintiff decided she was going to move out of their home and move in with her mother.

On April 20, 2020, the parties engaged in a physical confrontation, the facts of which were disputed. According to plaintiff, she arrived home and began taking bags to her car. Defendant emerged reeking of alcohol, angry that she was leaving and that she did not tell him about her affair. Defendant went into the kitchen and returned with a knife. Plaintiff testified she could not tell what kind of knife it was, but later learned it was a fruit knife. Plaintiff testified that defendant stated, "I should just kill you then bitch" and began "charging at [her]." Defendant got on top of plaintiff on the ground, held her down, and tried to stab her while she struggled to defend herself. She felt him stab her several times in the back, but could not tell if it pierced the skin at the time because of the adrenaline. Defendant punched plaintiff in the thigh area several times, but plaintiff managed to break free and began crawling away from him. Plaintiff called out to her son Tom for help, not knowing if he was home. She testified she feared for her life.

Plaintiff recounted that defendant then wrapped an extension cord around her neck and began to choke her. She testified she felt and heard "the bones in

4

the back of [her] neck . . . cracking." Tom and his friend came running out of his room and began punching defendant in the back to get him off plaintiff. Plaintiff's phone fell out of her shirt, and defendant released the cord, picked up the phone, and threw it against the wall. Plaintiff took the opportunity to get up and run outside. A neighbor tried to intervene, but defendant followed plaintiff and "slammed [her] face into the back of the car five times in front of [their] son" and the neighbor.

Another neighbor then confronted defendant. Defendant got into plaintiff's car and almost crashed into another vehicle. He got out of the car, leaving it running in the street, and plaintiff did not know where he went. A neighbor called police. When police arrived, they learned defendant was in the home, and they broke down the door and arrested him. Plaintiff subsequently applied for a temporary restraining order (TRO).

Defendant disputed plaintiff's version of the incident. He testified he told plaintiff to leave the house that evening because of her cheating. Plaintiff became angry and attacked him. He claims she ran into the kitchen, grabbed a knife, and attempted to stab him. Defendant wrestled the knife away from her and denied ever attempting to harm her with it. He also denied slamming her head into the car, but admitted "when [he] pushed her, she fell into the car." He

5

also acknowledged he grabbed her hair and pulled her wig off. He denied putting a cord around her neck.

Although plaintiff subsequently obtained a TRO, she did not pursue an FRO. Instead, the parties negotiated a consent order for civil restraints, which specified that "[a]ny and all issues and allegations raised by [p]laintiff [in the TRO complaint] may be reported as history on any future TRO obtained by [p]laintiff." The order also mandated that defendant have no contact with plaintiff, stay 1,000 feet away from her, and attend an anger management program. However, the parties later reconciled, disregarded the order, and purchased a home together.

Their relationship later deteriorated again, and they ceased speaking and opted to communicate solely through text message. In August 2022, defendant asked for a divorce. Plaintiff had moved out of their home but came back periodically to see their son.

The incident giving rise to the FRO at issue took place on September 16, 2022. On that date, defendant picked up Amy and her son from the homeless shelter and brought her to the marital residence. According to defendant, he brought Amy simply because she wanted to see Tom and her cousin, Sherry, who was also staying at the house. He claimed he did not think plaintiff would

be there. However, he saw plaintiff's vehicle in the driveway when they arrived and knew plaintiff would take issue with Amy's presence. He testified that when he saw plaintiff's car, he said "oh, boy, here we go." Nevertheless, he brought Amy into the residence.

Plaintiff contends that defendant's version of events is false and that he brought Amy there to "start up a conflict again" because "everything . . . started because of her." She testified that defendant entered the home with Amy and her child, and plaintiff became angry and upset "about the whole situation," demanding that Amy leave. Amy was "laughing" and recorded the altercation on her phone. Defendant responded that Amy was a guest and that she would not leave. Plaintiff did not relent, and defendant insisted that if Amy had to leave, Sherry should also go. Plaintiff called the police, who arrived shortly thereafter.

Plaintiff attempted to leave the home, but defendant taunted her as she was trying to get into her vehicle. In the presence of the police, defendant insisted the car was his, even though plaintiff primarily drove the vehicle, and defendant had his own car. Plaintiff showed police proof of her insurance, indicating that she was an insured driver of the car, even though defendant held the title. Plaintiff was ultimately able to leave the scene.

7

On September 19, 2022, plaintiff obtained a TRO against defendant, which was amended on October 7, 2022. She alleged harassment and cyber-harassment.[3] After a six-day hearing, the trial court found defendant committed the predicate act of harassment and entered an FRO against him.

The trial court found plaintiff's version of events was more credible than defendant's version. The court noted that her testimony regarding the prior acts of domestic violence was credible based on her demeanor, consistency, and candor, even when discussing events that painted her "in a negative light." On the other hand, the court deemed defendant less credible because he was not forthcoming, and portions of his testimony were "inconsistent[,] . . . not believable," and contradictory.

The trial court determined defendant committed the predicate act of harassment because he knew that bringing Amy to the residence—when he knew plaintiff was home—would upset plaintiff. Defendant claimed he did not know plaintiff was at the residence, but acknowledged he saw her vehicle in the driveway and, nevertheless, brought Amy into the home. The court noted that

---

[3] Because the court concluded plaintiff did not prove the predicate act of cyber-harassment and plaintiff does not appeal that finding, we do not address that issue.

A-2957-22

defendant even commented, "oh, boy, here we go," in recognition that there were going to be problems. Moreover, the court observed that while Amy purportedly wanted to see Tom, he was not home, and she made no effort to confirm he was home prior to going to the house. The court noted it was not reasonable for defendant to remain there once he saw plaintiff was at the home given the hostility between Amy and plaintiff. The court also found Amy's testimony lacked credibility because when she entered the home, she did not ask for her cousin Sherry or attempt to go upstairs to see her. Rather, Amy immediately started recording plaintiff on her phone, which demonstrated she was not there to see her cousin and brother.

The court noted defendant was well aware of the animosity between plaintiff and Amy and that plaintiff did not want her at the home. The strained relationship was evident based on plaintiff's belief that Amy was having an inappropriate relationship with defendant, her stepfather.[4] Additionally, defendant was well aware that Amy exposed plaintiff's affair, which led to the domestic violence incident in April 2020. In view of the previous history of domestic violence—most notably the April 2020 incident where the court found

---

[4] Although the court did not make a finding on whether Amy and defendant were in fact engaged in an inappropriate relationship, it did find credible that plaintiff believed the two were engaged in such a relationship.

plaintiff's version more credible—and noting Tom was not home at the time Amy allegedly wanted to see her brother, the trial court found plaintiff proved defendant had an intent to harass her.

The court observed defendant "brought [Amy] to the marital residence knowing full well that . . . plaintiff and [Amy] were estranged and that her presence would upset . . . plaintiff."  The court concluded it could "find no other rational explanation of bringing [Amy] to the home but for the purpose to harass . . . plaintiff."  The court noted that under H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003), "[a] finding of a purpose to harass can be inferred from the evidence and from common sense experience."

"In addition," the court found defendant had ordered Sherry to leave the residence and insisted plaintiff's car was his with the intent to harass plaintiff because he admitted that he only said this when he was mad at plaintiff for calling the police.

The court further determined—after examining the statutory factors under N.J.S.A. 2C:25-29(a)—an FRO was necessary to protect the health, safety, and welfare of plaintiff and to prevent further abuse based on the history of domestic violence between the two, most notably the violent incident in April 2020.

A-2957-22

## II.

Before us, defendant argues two of the three predicate act findings made by the trial court were not based on allegations in the amended TRO complaint. He further contends the harassment findings were inadequately supported, and the predicate act of harassment was not established. He also asserts the findings on the necessity for an FRO were inadequate and insufficiently supported.

Our scope of review is limited when considering an FRO issued by the Family Part. See D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). That is because "we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." Ibid. "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Deference is particularly appropriate where the evidence is largely testimonial and hinges upon a court's ability to make assessments of credibility. Id. at 412. We review de novo the court's conclusions of law. S.D. v. M.J.R., 415 N.J. Super. 417, 430 (App. Div. 2010).

The entry of an FRO requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, the court "must determine whether the plaintiff

11

has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402). Secondly, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6),[5] to protect the victim from an immediate danger or to prevent further abuse." Id. at 127; see also N.J.S.A. 2C:25-29(b) ("In proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse."); J.D. v. M.D.F., 207 N.J. 458, 476 (2011).

---

5  The six factors are:

> (1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment[,] and physical abuse; (2) [t]he existence of immediate danger to person or property; (3) [t]he financial circumstances of the plaintiff and defendant; (4) [t]he best interests of the victim and any child; (5) [i]n determining custody and parenting time the protection of the victim's safety; and (6) [t]he existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1)-(6).]

A.

Defendant first argues that his right to due process was violated because the trial court based its finding of harassment on allegations that were not in the complaint. More specifically, defendant contends that although the trial court's finding that defendant brought Amy to the home for the purpose of harassing or annoying plaintiff was pled in the complaint, the findings that defendant harassed plaintiff by telling the police the vehicle was his and demanding that Amy's cousin leave the house were not in the complaint. Accordingly, defendant argues it is necessary to remand the matter for a new hearing with a different judge pursuant to Rule 1:12-1(d).

Our Supreme Court has noted, "[i]t constitutes a fundamental violation of due process to convert a hearing on a complaint alleging one act of domestic violence into a hearing on other acts of domestic violence which are not even alleged in the complaint." H.E.S., 175 N.J. at 325 (alteration in original) (quoting J.F. v. B.K., 308 N.J. Super. 387, 391-92 (App. Div. 1998)). "A restraining order is limited to the facts contained in the domestic violence complaint." I.J. v. L.S., 328 N.J. Super. 166, 178-79 (Ch. Div. 1999). An FRO cannot be premised on allegations "outside the [complaint's] four corners." L.D.

A-2957-22

v. W.D., Jr., 327 N.J. Super. 1, 4 (App. Div. 1999). However, that is not what occurred in this instance.

Plaintiffs "often file complaints that reveal limited information about the prior history between the parties, only to expand upon that history of prior disputes when appearing in open court." J.D., 207 N.J. at 479. Frequently, "the trial court will attempt to elicit a fuller picture of the circumstances either to comply with the statutory command to consider the previous history . . . of domestic violence between the parties . . . or to be certain of the relevant facts that may give content to otherwise ambiguous communications or behavior . . . ." Ibid. The J.D. Court further noted, "[t]o be sure, some defendants will know full well the history that plaintiff recites and some parties will be well-prepared regardless of whether the testimony technically expands upon the allegations of the complaint." Id. at 480.

Initially we observe that both parties were intimately familiar with the facts surrounding the entire incident, including defendant demanding that Sherry leave the house and advising the police that plaintiff's car was his vehicle. Both interactions were related to the incident alleged in the TRO complaint—plaintiff's allegation that defendant harassed her by intentionally bringing Amy to the residence against the backdrop of their troubled relationship. In fact, it

was defendant who first testified that he asked Sherry to leave the house. Defendant also testified that he told police it was his car that plaintiff was trying to drive away from the premises. He later admitted that the BMW was "her car" and that he made contrary statements to police "[b]ecause [he] felt disrespected."

More fundamentally, the court's reference to these other, related incidents and its finding that "these two examples" fall within the definition of "an intent to harass" were findings made "[i]n addition" to its initial independent finding that defendant committed the predicate act of harassment—as indisputably set forth in the TRO complaint—by virtue of knowingly bringing Amy to the residence with the purpose to harass plaintiff. In short, the court's findings regarding these other two acts were not essential to its decision because the court had already found defendant harassed plaintiff. That the court found additional acts of domestic violence was not prejudicial to defendant given that he had notice of the central claim to this dispute set forth in the TRO for which he was found liable. If there was any error, it was harmless, and it did not impact the ultimate outcome of the case. "Any error . . . shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.

B.

Defendant next argues the trial court erred because: (1) there was only one incident—not a repeated course of conduct; (2) defendant had the right to bring Amy to the home as a half-owner and the only party living there at the time; (3) plaintiff's grievance is with Amy and not defendant; and (4) by saying Sherry had to go, Sherry was the only putative victim of harassment, not plaintiff.

The PDVA establishes protections for victims of domestic violence. N.J.S.A. 2C:25-19(a) defines domestic violence as follows: "the occurrence of [certain predicate] acts inflicted upon a person protected under this act by an adult or an emancipated minor[.]" Harassment is one of the qualifying acts under N.J.S.A. 2C:25-19(a)(13).

Harassment, under N.J.S.A. 2C:33-4, is defined, in relevant part, as follows:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> > (a)    Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

16

(b)    Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

(c)    Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

A communication under subsection a. may be deemed to have been made either at the place where it originated or at the place where it was received.

Defendant asserts that there was at most one act of domestic violence, and the court improperly found harassment under section N.J.S.A. 2C:33-4(c) because there was no "course of alarming conduct" or "repeated" acts. We are unpersuaded by this argument.

In State v. J.T., 294 N.J. Super. 540, 545 (App. Div. 1996), we previously determined that a "course of conduct" does not necessarily require a series of incidents. There, the defendant was convicted of harassment under N.J.S.A. 2C:33-4(c) for standing outside his wife's home and staring at her, despite a restraining order prohibiting him from contacting her. Id. at 542. Although the defendant did not speak to his wife, the trial judge nonetheless concluded his conduct constituted harassment because "he was there for the purpose of being seen," and his presence was a "passive form of a threat." Id. at 543. In affirming

the harassment conviction, we held that "[p]lacing oneself in a location and remaining there for some time may constitute a 'course of conduct.'" Id. at 545. We explained:

> it cannot be doubted that defendant positioned himself in a location where his wife could see him as she exited the house . . . . [H]e did so despite the injunction from "having contact" with his wife and from "harassing [her] in any manner." That he was there with the purpose to harass her can be inferred . . . from the totality of circumstances. There is a difference between engaging in a "course of alarming conduct" and "repeatedly committ[ing] acts with purpose to alarm or seriously annoy" another, and the fact repeated acts were not involved does not mean defendant did not engage in a "course of alarming conduct."

> [Id. at 544-45 (alterations in original).]

Defendant's purposeful acts—picking up Amy despite recognizing in advance it may cause a problem if plaintiff was at the residence; seeing plaintiff was home when he arrived, but nevertheless entering the home with Amy; refusing to have Amy leave when directed by plaintiff, thereby forcing plaintiff to contact the police; insisting Sherry leave the house; and then falsely claiming to police that plaintiff was attempting to leave with his car—were sufficient under J.T. to constitute a course of alarming conduct.

Defendant further contends that, as half-owner of the residence, he had the right to be at the property, and he was not responsible for any act of domestic

18

violence merely by the presence of Amy at the residence. Defendant did have a right to be at the property, and Amy's presence at the residence, in itself, does not necessarily equate to an act of domestic violence. The trial court here did not find otherwise. However, the court determined defendant did not have a right to harass plaintiff.

Our Supreme Court has observed, "[o]ur law is particularly solicitous of victims of domestic violence . . . . At its core, the [PDVA] effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks to assure these victims." State v. Hoffman, 149 N.J. 564, 584 (1997).

The court, in its well-reasoned and comprehensive decision, inferred an intent to harass from defendant's conduct in knowingly arranging to bring Amy to the residence despite his knowledge of the hostility that existed between the mother and daughter, coupled with defendant's knowledge of plaintiff's presence at the property and his conduct when he arrived. This was not some minor dispute between plaintiff and Amy. The acrimony here was so significant that plaintiff kicked Amy and her own grandchild out of her home despite knowing they would be living in a homeless shelter. The court considered defendant's actions in the context of this strained relationship and found that defendant knew

19

that bringing Amy to the home would alarm or seriously annoy plaintiff and did so anyway. That is, the court did not view the evidence in a vacuum. As the Supreme Court noted, "[a] history of domestic violence may serve to give content to otherwise ambiguous behavior and support entry of a restraining order." J.D., 207 N.J. at 483. We conclude there was ample evidence in the record to support the court's conclusion that defendant acted with the requisite purpose to harass plaintiff.

C.

Defendant asserts that even if the court properly found a predicate act of harassment, it erred in determining an FRO was necessary to protect plaintiff. He maintains the court gave disproportionate attention to the history of domestic violence and "failed to appreciate" the nearly two-and-a-half-year gap between the last act of domestic violence and the alleged conduct here. He contends the court failed to consider that the parties' divorce, equitable distribution, and other remedies "will end the parties' squabbling." Defendant's arguments are unconvincing.

The court understandably gave particular weight to the parties' previous and troubling history of domestic violence. The court noted the "most significant" incident took place in April 2020, which resulted in a TRO against

20

defendant after he repeatedly stabbed plaintiff with a fruit knife, wrapped a cord around her neck, and "slammed her head on the car five times." Plaintiff had also testified regarding her fear of defendant, stating, "I can't hang in there no more. I'm not going to die by the hands of him. I want him to stay away from me." Finding an FRO was "necessary to protect the health, safety and welfare of" plaintiff, the court determined plaintiff had met her burden under the second Silver prong. 387 N.J. Super. at 126. The court made specific findings of fact and conclusions of law after considering the conflicting testimony and based its decision on competent, relevant, and credible evidence. We discern no basis to disturb the court's findings.

To the extent we have not addressed any of defendant's other arguments, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2957-22