# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5909-17T3

A.S.Y.,

    Plaintiff-Appellant,

v.

J.L.,

    Defendant-Respondent.

_____

Argued July 9, 2019 – Decided August 14, 2019

Before Judges Hoffman and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-0317-18.

Victoria L. Chase argued the cause for appellant (Rutgers Domestic Violence Clinic, Rutgers Law, attorneys; Victoria L. Chase, of counsel and on the brief).

Michael J. Confusione argued the cause for respondent (Hegge & Confusione, LLC, attorneys; Michael J. Confusione, of counsel and on the brief).

PER CURIAM

Plaintiff A.S.Y. (Ann)[1] appeals from the denial of her application for a final restraining order (FRO) against her former boyfriend, defendant J.L. (Joe), under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. After a review of the contentions in light of the record and applicable principles of law, we affirm.

We derive the facts from the parties' testimony at trial. In 2015, the parties met when Joe was in New Jersey visiting his sister, a friend of Ann's. In September 2016, Joe returned to New Jersey from Texas, where he lived, to attend "a prom" with Ann. The parties began a "romantic long-distance relationship" in January 2017,[2] which lasted until July 2017. Ann stated that because of the long-distance relationship and being "so far apart," she sent a "lot of intimate photos and videos" of herself to Joe.[3]

In February 2017, Joe believed that Ann had been unfaithful and was in a sexual relationship with her child's father. As a result, Joe tried to end the relationship during a phone call. However, following Joe's call, Ann "had a

---

[1] We use initials and pseudonyms for the parties' privacy. R. 1:38-3(d)(10).

[2] Joe testified that he believed their relationship formally began at "the end of [20]16."

[3] Joe testified he had "millions" of photos.

panic attack." When Ann went to the emergency room, she learned that she required surgery to remove her gall bladder. Hearing that Ann needed surgery, Joe "backed off of . . . wanting to end[] the relationship," decided he wanted "to stick by [Ann's] side," and continued dating her. In the days that followed, Ann swore she was deeply in love with Joe, was sure she was going to be his wife, and declared her loyalty to him.

In March 2017, Joe came to New Jersey to visit plaintiff for three days, but a snowstorm extended his visit to a week. During this visit, Ann decided she "no longer wanted to pursue [the] relationship with [Joe] anymore"; however, she did not share this realization with him. Joe corroborated that Ann never told him she wanted to end the relationship and continued sending him intimate photos. Although Ann stated she "absolutely" did not send Joe any photos after the March visit, Joe produced pictures and videos sent from Ann throughout March, April, and early May.

After Joe returned to Texas in late March, he learned Ann was seeing another man that he referred to as "Old Boy." Ann had taken a picture of herself with Old Boy and sent it to Joe to show that the two had gone out to eat the day after Joe had left New Jersey.

A-5909-17T3

In late April to early May, plaintiff stated she went to the Dominican Republic for plastic surgery.[4] While there, Joe became upset with Ann when she did not call him on his birthday. Ann recalls that she told Joe while she was away that they "should just go back to just being friends."

Ann testified that, because she was trying to break up with him, Joe threatened to post her "intimate photos." Ann claimed that Joe told her on the phone: "You need to delete your social media for a while because I am going to post you online." So Ann decided to "pump[] the breaks [sic]" and the two continued their long-distance relationship, planning to go to Jamaica at the end of August.

When Joe came to New Jersey in June for Father's Day and Ann's birthday, Ann introduced him to her child's father. Joe believed the meeting was a set up for him to fight the man. He said that after that incident, he was "completely over" Ann, but he did not share his feelings with her or end their relationship. The two continued "talking" after the June visit.

On July 3, Ann "Facetimed" Joe, informing him she wanted to "pay [her] own way" for the Jamaica trip because she didn't want to feel "obligated to be

---

[4]  The photos sent by Ann on May 7 were "surgical photos," which revealed intimate body parts.

A-5909-17T3

intimate with [Joe] on [the] island because [he] paid [her] way."  Ann testified she told Joe she still wanted to be friends even though the long-distance relationship had not worked out.  She said Joe responded by messaging her that he wanted to "post [her] online."  The parties continued arguing that evening through text messages.

Sometime later, Ann alleges Joe deleted her as his friend on Facebook and posted six explicit and intimate pictures of her on his Facebook page.[5]  One post included a collage of plaintiff's pictures as an advertisement for herself.  Another post included a photo of plaintiff with a meme stating, "the actual retail price of that pussy is a lime margarita and a blunt."  Ann stated she did not see the pictures because they were no longer Facebook friends, but other people including "strangers," "co-workers, famil[y], [and] friends" began messaging her, informing her about the post, and sending her screenshots of the pictures.  In response, Ann sent Joe a picture of herself that evening, describing it as more "flattering," with a message saying "[a]dd these to my ad."

At trial, Joe denied posting the pictures or telling Ann that he would post pictures.  He stated a man named "Prince" had created the collage posted on his

---

[5]  The screenshots of these photos in the record are not dated.  It is unclear whether Joe posted all the photos on July 3, or sporadically until July 7.

Facebook page. He also said Ann had spoken to Prince about it. However, Joe conceded he posted a picture of Ann and Old Boy in order to "expose[]" Ann as Old Boy's "side chick" since Old Boy did not have social media.

Between July 3 and July 7, 2017, the parties spoke "numerous" times. At some point, Ann said Joe called her and attempted to apologize for posting the pictures. Ann responded by telling Joe that she accepted his apology, but he could not "apologize to [her] privately and embarrass [her] publically."

On July 7, Joe apologized to Ann in a Facebook post. He noted in his statement that Ann had already accepted his apology, but he felt it important to apologize to her publically as well. No further pictures were posted. Ann asserted she believed the public apology meant the two "were going to get back together." She said the parties had "normal" texting conversations over the next several weeks.

Ann also described "a fake Facebook page" that appeared on July 12, 2017, containing an intimate video she had made and shared only with Joe. She testified, however, that the Facebook page and the video posting were "not connected to [Joe] in any way." Joe denied creating the page and believed Prince did it. He presented text messages to the judge revealing conversations between Ann and Prince about the page.

A-5909-17T3

Several days later, more photos were posted in a private group message. These photos were screenshots of the parties' Facetime conversations, and depicted Ann "post-operatively" "changing [the] gauzes on [her] bandages" after her procedure in the Dominican Republic. Ann said she was not in the group message, but learned about the photos when other people sent them to her. Joe denied posting those pictures.

Ann filed a police report on July 21, 2017, accusing Joe of harassing her by posting nude photos of her on social media without her consent. She told the police she learned about the post from her co-workers. During the trial, Ann explained she "only . . . went to the police station" because her "supervisor . . . told [her] to go." She reiterated that she had not planned on going to the police, but her co-workers told her she "need[ed] to document this."

The next day, Ann believed someone had attempted to break into her email account. She contacted Joe and asked him to leave her alone. Joe replied: "I don't know what you're talking about. . . . I don't know your email. Please don't text me again. I'm done with you. I want no problems. Enjoy your life."

On July 24, 2017, Ann applied for, and received, a temporary restraining order (TRO). In her application, Ann asserted that a few months before, Joe had threatened to post pictures of her on social media if she decided to end their

A-5909-17T3

relationship. And, that Joe posted unauthorized pictures of her on social media. Ann alleged acts of terroristic threats, N.J.S.A. 2C:12-3, harassment, N.J.S.A. 2C:33-4(a), and cyber harassment, N.J.S.A. 2C:33-4.1.

Ann also brought a civil suit against Joe for posting the photos. After a default judgment, Ann was awarded $10,000 for her pain and suffering arising out of Joe's actions. Joe advised during the FRO hearing that he was not served in the civil suit because Ann had intentionally given the court the wrong address. He was unaware of the litigation until a $10,000 garnishment was placed on his bank account.

When the parties appeared for trial on May 29, 2018, the judge advised them of their right to retain counsel and the trial process. The case was adjourned until June 19. Neither party chose to retain counsel. On June 19, Joe advised the judge that Ann had followed him to his sister's house from court on May 29, but he had not spoken to her.

The judge heard lengthy testimony from both parties as well as Ann's witness and reviewed a voluminous number of text messages. In a comprehensive oral decision on June 19, 2018, the judge denied Ann's application for an FRO because Ann had failed to meet her burden of proof as to the three alleged predicate acts.

In assessing the parties' credibility, the judge stated she had "issues" with Ann's credibility. In discussing Ann's testimony, the judge noted Ann repeated numerous times that she intended to break up with Joe and that made him so upset that he threatened to post the videos or pictures and did post them. But, the evidence was the "absolute opposite." The judge stated:

> It's [Joe] saying I'm done with [Ann] and [Ann] practically begging, actually in some points may have used the words begging, to stay in the relationship. So, while it's possible that [Ann] also said she was going to break up with [Joe], the way it was presented, the way [Ann] was so adamant that she was the one who broke up with him, when the evidence very clearly shows at a minimum he had said more than once he was breaking off the relationship, I find that damages [Ann's] credibility.

The judge concluded that Ann had attempted to create a motive for Joe to support her FRO.

The judge also noted the inconsistencies in Ann's testimony, such as her professed distress from the posting of the intimate photos contradicted by her actions in sending Joe additional photos in which "[she] looked good" after the postings. Furthermore, the judge stated Ann had not seen any of the posts herself, but only provided the court with screenshots of the alleged posts sent to her by other people.

9

In addressing the act of harassment, the judge found Ann had not established Joe had posted the pictures. She found Joe more credible as to his version of the events and noted his denial of the posting was supported by his text messages saying, "I'm done. You lied. Stop. You lied. You lied." The judge stated: "At a minimum . . . it's possibl[e] either story is possible. That's not enough to tip the scale to say is it more likely than not. I do not find that [Ann] has shown it more likely than not."

The judge also found plaintiff had not established the predicate acts of terroristic threats and cyber harassment. In discussing the allegation of terroristic threats, the judge noted Ann had not presented any testimony that demonstrated "[Joe] threatened to commit a crime of violence with purpose to terrorize [Ann] or threaten to kill or with the purpose to put an imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat."

Noting Ann did not support her allegations of harassment because she had not established a purpose to harass, the judge similarly concluded Ann had not demonstrated an act of cyber harassment. She noted N.J.S.A. 2C:33-4.1(a)(2) required a defendant to knowingly post or send "indecent . . . or obscene material to or about a person with the intent to emotionally harm a reasonable person or

place a reasonable person in fear of physical or emotional harm to . . . her person." Because Ann had not established by a preponderance of the evidence that Joe posted the photos or intended to emotionally harm her, she had not proven the predicate act.

The FRO was denied; the TRO was vacated. The subsequent motion for reconsideration was denied on July 9, 2018.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We owe substantial deference to the Family Part's findings of fact because of its special expertise in family matters. Id. at 413. The trial court's findings "are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 412. This deference is particularly appropriate where the evidence at trial is largely testimonial and hinges upon a court's ability to assess credibility. Gnall v. Gnall, 222 N.J. 414, 428 (2015). However, we owe no special deference to the trial judge's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

When determining whether to grant an FRO, a trial judge must engage in a two-step analysis. Silver v. Silver, 387 N.J. Super. 112, 125-26 (App. Div. 2006). "First, the judge must determine whether the plaintiff has proven, by a

preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125; see also N.J.S.A. 2C:25-29(a) (providing that an FRO may only be granted "after a finding or an admission is made that an act of domestic violence was committed").

Second, the court must determine that a restraining order is necessary to provide protection for the victim. Silver, 387 N.J. Super. at 126; see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011) (explaining that an FRO should not be issued without a finding that "relief is necessary to prevent further abuse" (quoting N.J.S.A. 2C:25-29(b))).

Ann argues on appeal that the trial judge erred in finding she did not establish her claims of harassment and cyber harassment. We are not persuaded.

A conviction of cyber harassment under N.J.S.A. 2C:33-4.1(a)(2) requires a finding that a person acted "knowingly"; that is, the person must be "aware that it is practically certain that his conduct will cause such a result." N.J.S.A. 2C:2-2(b)(2). To support a finding of harassment, there must be proof that a person made a communication "in a manner likely to cause annoyance or alarm to the intended recipient." J.D., 207 N.J. at 477. An assertion by a plaintiff that she felt harassed is a subjective belief and insufficient to prove a purpose or intent to harass. Id. at 484.

Following lengthy testimony from both parties and a review of the proffered photographs, posts, and messages, the judge made credibility determinations and issued a well-reasoned opinion. She found that Ann had not established the requisite intent on Joe's part necessary under both statutes to show he acted knowingly or had a purpose to harass.

While we do not condone the dissemination of sexually explicit photographs without the subject's consent, and we do not minimize the wrongfulness of one who does so, given our high standard of deference to the judge's credibility determinations and findings of fact, we discern no reason to disturb the court's ruling. The evidence Ann presented was inconsistent and contradicted by her actions.

Because Ann did not establish a predicate act of domestic violence, we need not address the second Silver prong as to the necessity of an FRO. We only note the indifference and inaction by Ann to the postings until her co-workers urged her to file a police report. We also note the parties' acknowledgment there is no relationship between them and there was no communication in the inexplicable yearlong period that elapsed between the grant of the TRO and the trial. The fact that the postings cannot be erased from the internet does not satisfy the intent behind the issuance of an FRO: to prevent

future harm from "immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. We discern the remainder of Ann's arguments without merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14

A-5909-17T3