# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5997-17T4

A.I.H.,

    Plaintiff-Respondent,

v.

Z.O.F.,

    Defendant-Appellant.

_____

> Argued August 13, 2019 – Decided September 3, 2019
>
> Before Judges Messano and Natali.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FV-18-0122-19.
>
> Michael B. Roberts argued the cause for appellant (Roberts & Teeter LLC, attorneys; Michael B. Roberts, on the briefs).
>
> Bonnie M. Weir argued the cause for respondent (The Weir Law Firm, LLC, attorneys; Bonnie M. Weir and Marie-Christine Aziz, on the brief).

PER CURIAM

Following a hearing before the Family Part, defendant appeals from a final restraining order (FRO) granted to plaintiff pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant argues that the trial judge's finding of harassment was against the weight of the evidence, and that there was insufficient evidence to support a finding that plaintiff was in need of a FRO. We disagree with defendant's contentions and affirm.

## I.

The record from the FRO proceeding established that defendant and plaintiff are the unmarried parents of a young son, and at the time of the underlying events, they jointly owned a home. The parties' relationship ended following an incident on March 27, 2018, one month after their child was born.

Plaintiff identified the March 27, 2018 incident as part of the parties' "prior history of domestic violence" and testified, "credibly" according to the trial court, that during the incident defendant bruised her mouth and arms, that the family dog had to get between them to stop the altercation, and that she moved out of the residence as a result. Plaintiff also alleged that defendant harassed her a number of times in June and July 2018. The March, June, and July 2018 incidents became the subject of plaintiff's complaint under the PDVA.

A-5997-17T4

Based on plaintiff's testimony at the FRO hearing, the March 2018 assault began when defendant criticized her for not cooking, forcibly removed a television remote control from her hand, and blocked her from leaving the living room of the home. Defendant also pushed her onto a couch and threw plaintiff's cell phone across the room to prevent her from contacting the police. While holding her down on the couch, defendant screamed "what's wrong with you," and continued to restrain plaintiff by "holding [her] down with his hands" and with "his body . . . on top of [her]."

Defendant eventually released plaintiff, and when she denied his continued requests to talk, she attempted to scream but he covered her mouth with his hand. She responded by biting his hand, which enabled her to escape briefly to the bathroom where she locked the door. At this point plaintiff's lip was swollen and bleeding. Defendant took a hairpin, opened the door and when he saw plaintiff's bloody lip, ran the water and told her to "clean [her]self up."

Plaintiff again attempted to leave the residence when defendant insisted that they still "need[ed] to talk." Despite her demands that defendant leave her alone, he did not. She tried to use his phone "to call for help" but as soon as she grabbed it, he "snatched it from [her] hand and threw it across the room." She was able to grab her car keys but defendant "snatched" them as well and broke

them. Defendant fell on the floor and the family dog jumped between the parties which permitted plaintiff to run down the steps toward the front door.

Defendant chased plaintiff down the steps. When he fell again, plaintiff opened the front door and "screamed, and . . . screamed and . . . screamed." A neighbor witnessed plaintiff screaming and brought her into her apartment and gave her clothes as she was wearing only a t-shirt and underwear when she fled from defendant.

The police arrived shortly thereafter, arrested defendant, and charged him with harassment and false imprisonment. Those charges were dismissed, however, after plaintiff advised the prosecutor that she felt safe around defendant. But, at the FRO hearing, plaintiff testified that her statement to the prosecutor was untrue and was only made after defendant and his mother encouraged it and because she was "trying to do the right thing for [her] son."

As noted, plaintiff detailed a series of incidents of harassing conduct committed by defendant in June and July 2018, primarily involving issues surrounding the production of breast milk for the parties' son, and particularly defendant's dissatisfaction with the quantity of breast milk. Specifically, on June 15, 2018, at St. Peter's Hospital in New Brunswick, where both parties worked, plaintiff advised defendant by telephone that due to the stress caused

by their recent interactions, she would be unable to produce sufficient breast milk for the entire weekend, when defendant was scheduled to exercise his parenting time. Defendant stated he "didn't want to hear it," that plaintiff stressed herself out, blamed her for the end of the relationship, said "fuck you," and called her a "bitch." After plaintiff hung up the telephone, defendant called her back five times within ten minutes from his work phone, as she had blocked his cell-phone number. He also sent a series of emails accusing plaintiff of withholding breast milk from their son. Defendant's conduct upset plaintiff to the point that she asked a co-worker to accompany her to her car at the end of their shift. Plaintiff later learned that defendant waited for her at her car for thirty minutes.

Approximately two weeks later, on June 30, 2018, plaintiff testified that she was scheduled to meet defendant in a local parking lot in order to provide him with a supply of breast milk. When defendant arrived, he parked his car behind plaintiff's, effectively blocking her in her parking spot. She got out of her car to hand defendant the breast milk in a "special freezer bag," and briefly interacted with her son who was in the car. When plaintiff reminded defendant to return the freezer bag, he became angry and sped off while she was so "close to the car" that she thought she "was going to get hit . . . ."

A-5997-17T4

Less than a week later, on July 5, 2018, defendant came to plaintiff's home to pick up their son when defendant stated the amount of breast milk plaintiff provided was insufficient. She disagreed and asked defendant to leave. He refused. Plaintiff closed the door and walked away, but defendant knocked and when plaintiff's brother answered, defendant maintained he needed more breast milk for the weekend. Plaintiff had extra breast milk she kept frozen for emergencies and gave it defendant. She again asked him to leave but he refused and stated, "why are you denying our son breast milk?" and "what kind of mother are you?"

Plaintiff admitted becoming irate at the comments, and disparaged defendant. She also admitted that when defendant attempted to record her on his cell phone, she falsely stated that defendant was punching and kicking her. Defendant only left plaintiff's residence when she threatened to call the police. She stated that these repeated interactions with defendant "overwhelm[ed]" and "stress[ed]" her.

Finally, the next day, on July 6, 2018, plaintiff asked defendant if they could arrange pickup of their son at the police station "because of [the] prior incidents and escalation of his temperament." Defendant refused and when he arrived at plaintiff's home, plaintiff was accompanied by her cousin and

6

neighbor. Defendant refused to release the parties' son to plaintiff's cousin, despite plaintiff's specific direction to defendant via text message. When plaintiff eventually relented to defendant's demand, and physically left her home to personally pick up their son, defendant refused to remove his hand from the car seat. Plaintiff told defendant three times to remove his hand, and when he eventually did so, plaintiff said, "[t]his is why I wanted to do this at the police station." In response, defendant called her a "bitch" and asked, "what's wrong with you?"

On July 9, 2018 plaintiff filed a complaint in support of a temporary restraining order (TRO), relying on the June and July 2018 incidents. Although she detailed the March 2018 assault when describing the history of domestic violence between the parties, she did not include that incident as a predicate act warranting a restraining order or file a request for a restraining order based on that incident.

With respect to the events that took place in June and July 2018, defendant denied that he nearly hit plaintiff with his car and that his repeated attempts to communicate with her were made with a purpose to harass her. Instead, defendant maintained that he was concerned that the parties' child would not have enough breast milk. As to the March 2018 prior incident of domestic

violence, defendant argued that "[plaintiff] voluntarily dismissed" the criminal charges against him, and stressed that he "immediately got an expungement" of the incident from his record. Plaintiff's mother also testified at trial, and corroborated plaintiff's testimony regarding her bruised and swollen lip as a result of the March 2018 incident.

At the conclusion of the testimony, the trial court issued an oral opinion in which it found that plaintiff and her mother testified credibly, and made several findings of fact contradicting defendant's claim that he did not act with purpose to harass plaintiff during the underlying events. The court determined that defendant's conduct in June and July 2018 constituted harassment under N.J.S.A. 2C:33-4 and, considering the parties' history, a FRO was necessary to protect plaintiff from further harassment.

In evaluating whether defendant's conduct was harassing, the court considered the parties' history of domestic violence, and found that as a result of the March 2018 incident, plaintiff "became . . . concerned about her welfare, her safety, because of how [defendant] was acting." The court noted that defendant's testimony corroborated plaintiff's claim that defendant's intent was to prevent her from leaving the home, and also credited plaintiff's testimony, and her mother's, that plaintiff sustained bruising and other physical injury as a

result of defendant's actions. With respect to the June and July 2018 incidents, the court found that defendant's repeated conduct "was for the purpose of talking to [plaintiff] or seeing her in some form," and he "did not want to avail himself of the alternatives to get the breast milk from her family members." The court found defendant's purpose in contacting plaintiff was "not for the purpose of getting the breast milk but for the purpose of having some type of control over her, to have her in his life, to speak to her, to constantly contact her." Accordingly, the court "f[ou]nd by the preponderance of the evidence that the predicate domestic violence act of harassment has been demonstrated by [plaintiff's] credible testimony."

After explaining that the determination of whether to issue a FRO "is in some cases self-evident," the court noted that "the guiding standard is whether to protect the victim from immediate danger or to prevent further abuse." The court found plaintiff "is concerned for her well-being," and that "[s]he's afraid of [defendant] because of his recent temperament" after the March 2018 incident "where he wouldn't let her leave, where he was on top of her, restraining her, covering her mouth to stop her from speaking and screaming, [and] causing injury to her mouth." The court recounted the June and July 2018 incidents and concluded that "[i]t is clear . . . that the plaintiff has met her burden by the

9

preponderance of the evidence to demonstrate that a [FRO] is necessary to stop" defendant from "harassing" plaintiff. This appeal followed.

## II.

On appeal, defendant argues that the trial court committed reversible error by finding he committed the predicate act of harassment, as the evidence from the FRO hearing did not establish that defendant spoke or acted with a "purpose to harass" plaintiff. Instead, he characterizes his conduct, as well as the use of "coarse language" and other demeaning comments directed toward plaintiff, as "the frustrations of a new parent" that were not intended to harass. Defendant also contends that plaintiff failed to establish a FRO was necessary to protect her from future acts of domestic violence as required under the second Silver[1] prong. We disagree.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We owe substantial deference to Family Part judges' findings of fact because of their special expertise in family matters, id. at 413, particularly where the evidence is largely testimonial and rests on the judge's credibility findings. Gnall v. Gnall, 222 N.J. 414, 428 (2015). We will not "disturb the 'factual findings and legal conclusions of the trial judge unless [we

---

[1] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

The PDVA accords protection, such as a FRO, to victims of "domestic violence," a term which the Act defines by listing predicate offenses contained in the New Jersey Criminal Code. J.D. v. M.D.F., 207 N.J. 458, 473 (2011) (citing N.J.S.A. 2C:25-19(a) and -26). Before a FRO may issue, the court must engage in a two-prong analysis and make specific factual findings and legal conclusions. See Silver, 387 N.J. Super. at 125-27. First, the court must determine, "in light of the previous history of violence between the parties," id. at 125 (quoting Cesare, 154 N.J. at 402), "whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25–19(a) has occurred." Ibid.; see N.J.S.A. 2C:25-19(a)(13) (listing harassment as a predicate act of domestic violence).

Upon finding the commission of a predicate act, the court must then determine if a restraining order is necessary to protect the party seeking restraints from future acts or threats of violence. Silver, 387 N.J. Super. at 126-27. In other words, the court must find that "relief is necessary to prevent further

11

abuse." J.D., 207 N.J. at 476 (quoting N.J.S.A. 2C:25–29(b)); see Silver 387 N.J. Super. at 127 (explaining that the court must find that a FRO is necessary to protect "the victim from an immediate danger or to prevent further abuse"). This second determination, like the first, "must be evaluated in light of the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse," as well as "whether immediate danger to the person or property is present." Silver, 387 N.J. Super. at 127 (citing N.J.S.A. 2C:25-29(a)(1) and (2)).

The judge here determined that defendant committed the predicate act of harassment. Pursuant to N.J.S.A. 2C:33-4, " a person commits a petty disorderly persons offense of harassment, if, with purpose to harass another, he" or she:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

Defendant maintains that "[n]one of the . . . incidents [p]laintiff testified to constitute harassment." In particular, defendant contends that his "repeated

12

demands for breastmilk so he could feed his son fall far short of verbal harassment," and that his conduct was "appropriate, reasonable, and certainly [made] without purpose to harass." Further, defendant argues that because the "court below did not find that [he] had an intent to harass [p]laintiff," and because "none of the competent evidence would support such a finding," the court's conclusion that defendant committed harassment must fail. Again, we disagree.

Defendant correctly notes that a "purpose to harass another" is a necessary element of harassment. See N.J.S.A. 2C:33-4; see also J.D., 207 N.J. at 487 (stating that, to find a party acted with purpose to harass, there must be "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient"); State v. Hoffman, 149 N.J. 564, 577 (1997) (explaining that "[a] finding of a purpose to harass may be inferred from the evidence presented," then noting "[c]ommon sense and experience may inform that determination"). However, we reject defendant's claim that the trial court failed to make that finding, as well as his claim that the record does not support such a finding.

Rather than merely finding that defendant "had an intent to communicate with . . . and to see the [p]laintiff," as defendant contends, the court found his

repeated communications were made "not for the purpose of getting breast milk but for the purpose of having some type of control over [plaintiff], to have her in his life, to speak to her, to constantly contact her." Although the court did not use the magic words "purpose to harass," the court's unequivocal rejection of defendant's purported reason for continuously contacting plaintiff, coupled with the court's finding that defendant's true "purpose" was to exert "some type of control over her," sufficiently convey that message. Cf. L.C. v. M.A.J., 451 N.J. Super. 408, 414 (App. Div. 2017) ("Plaintiff provided . . . sufficient detail to suggest that defendant's communications were not so innocent and, in reality, were made with a purpose to harass and exert control over her in a manner consistent with alleged past conduct."); D.N. v. K.M., 429 N.J. Super. 592, 598 (App. Div. 2013) (deciding in the context of a FRO hearing that "[w]hile the judge could have stated more, giving the deference we must, we are satisfied the findings sufficiently support the court's conclusions").

Further, the record supports a finding that defendant's "repeated demands for breastmilk" were made with purpose to harass plaintiff, in addition to the remaining elements of the harassment statute. In this regard, we note that defendant's conduct was not an isolated event. The record demonstrated that the communications at issue stretched over several months. During the June 15,

14

2018 incident, which occurred over two months after the March 2018 incident, plaintiff told defendant "[i]f you aren't messaging me about when you will be with [the parties' son] then do not contact me." Defendant was undeterred and continued to e-mail plaintiff, which prompted her to call him and remind him of their prior arrangement for defendant to obtain breast milk from plaintiff's family members without the parties having to meet each other, and explained that the stress he was causing her affected her ability to produce additional breast milk.

According to plaintiff's "credible" testimony, defendant proceeded to say "fuck you" and called her a "bitch," then sent three additional e-mails in essence calling plaintiff a bad mother, went to her car and waited there for thirty minutes, and telephoned her five times within five-to-ten minutes on his work phone because plaintiff had blocked his cell phone number. This incident alone, and especially when viewed through the prism of the March 2018 incident, supports the trial court's decision to reject defendant's claim that his purpose was to obtain breast milk, and supports a finding that defendant's "conscious object" was to harass and "annoy" plaintiff. See J.D., 207 N.J. at 487; N.J.S.A. 2C:33-4(a).

Further, considering plaintiff's testimony that defendant nearly hit her with his car two weeks later, that he refused to leave her home the following

15

week until he knew the police were coming, and he unnecessarily prevented her from gathering their child's car seat the next day, there is sufficient evidence in the record to infer defendant engaged in a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy" plaintiff in violation of N.J.S.A. 2C:33-4(c).

For similar reasons, we disagree with defendant's claim that the trial court incorrectly concluded a FRO was necessary to protect plaintiff from further harm. Since harassment is an enumerated predicate act of domestic violence, the need to prevent further harassment is sufficient to satisfy Silver's second prong. Further, because the court was required to consider the totality of the circumstances when evaluating defendant's alleged harassing communications, it properly viewed the parties' June and July 2018 interactions through the prism of the March 2018 incident, which we view as a significant and alarming prior act of domestic violence. That incident not only supported a finding that defendant committed the predicate act of harassment, as it reflected his intent to annoy plaintiff, see C.M.F. v. R.G.F., 418 N.J. Super. 396, 404 (App. Div. 2002), but the March 2018 incident also correctly informed the court's consideration regarding the need to protect plaintiff against further abuse.

Indeed, plaintiff testified that as a result of the March 2018 incident, she was uncomfortable with defendant's temperament, no longer felt safe around him and, accordingly, was never alone with him. She specifically testified that the June and July 2018 incidents caused her to become "scared," "nervous," and affected her physical well-being by causing her stress and to feel overwhelmed. That prior history of domestic violence was an appropriate factor warranting the entry of an FRO. See N.J.S.A. 2C:25-29(a)(1).

Moreover, defendant's own testimony corroborated the existence of a need to protect plaintiff from future incidents of harassment. During the July 5, 2018 incident, after plaintiff asked him to leave her residence multiple times, defendant refused simply because he "didn't have what [he] wanted." Similarly, the trial court found with respect to the June 15, 2018 incident, defendant repeatedly contacted plaintiff and even waited outside of her car for thirty minutes simply because he "did not want to avail himself of the alternatives to get the breast milk from [plaintiff's] family members." Simply put, the record establishes that defendant has done what he wants to do without regard to plaintiff's desire to be left alone. This has repeatedly required third-party intervention to protect plaintiff from harm, whether it was neighbors and the family dog in March 2018 or, as the trial court noted, defendant's "kn[o]w[ledge]

[that] the police w[ere] going to come" in July 2018, as opposed to "his own volition." Accordingly, the trial court's determination that a FRO was necessary to protect plaintiff from further abuse is sufficiently supported by the record.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5997-17T4