# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3044-23

B.B.,[1]

    Plaintiff-Respondent,

v.

A.M.-L.,

    Defendant-Appellant.

_____

Submitted May 12, 2025 – Decided June 6, 2025

Before Judges Sabatino and Jablonski.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-2291-24.

John C. Iannelli, attorney for appellant.

Christine M. D'Elia, attorney for respondent.

PER CURIAM

---

[1] We use initials in this domestic violence appeal to protect the complainant's identity. R. 1:38-3(d)(9); N.J.S.A. 2A:25-33.

Defendant A.M.-L. appeals the Family Part's entry of a Final Restraining Order ("FRO") against him in favor of plaintiff B.B. after a trial pursuant to the Prevention of Domestic Violence Act ("PDVA"), N.J.S.A. 2C:25-17 to 25-35. In essence, the trial judge found that plaintiff had credibly proven that defendant persisted in having harassing communications with her after the parties' dating relationship had ended, and that the communications made her fearful.

Defendant appeals, contending that plaintiff's proofs were insufficient to establish (1) the elements of harassment under N.J.S.A. 2C:33-4, and (2) that plaintiff had a future need for restraints. We affirm, substantially for the cogent reasons stated by Judge Daniel A. Bernardin in his June 4, 2024 oral opinion.

As elaborated more fully in the trial record and in the judge's decision, the pertinent background is as follows. The parties were in a dating relationship between July 2021 and May 2023. After it ended, defendant continued to initiate contact with plaintiff, in efforts that he hoped would revive the relationship. Plaintiff described those contacts at length in her testimony.

Among other things, plaintiff recounted that on Thanksgiving weekend in 2023, defendant sent her multiple text messages that made her particularly distraught at an emotional time, since that was around the date of her deceased father's birthday. Defendant's messages intimated that he was thinking of killing

himself, warning plaintiff that his next message to her "may be a different kind of goodbye." Plaintiff blocked defendant's phone number, but he texted her again on November 29 from a new number.

Defendant sent her a series of emails attaching various unwanted videos. He electronically sent plaintiff a "Cash App" for $50, which she refunded. He also sent her unsolicited flowers and letters.

Plaintiff testified the unwanted contacts continued with incidents in December 2023. At about 6:00 a.m. on December 3, 2023, defendant dropped off several gifts on the porch of her mother's residence, where plaintiff had been living. He also left two letters to plaintiff, one of which was about sixteen typed pages. That letter referred to several topics that were traumatic to plaintiff and again expressed defendant's thoughts of suicide.

After the December 3 incident, plaintiff's mother telephoned defendant in plaintiff's presence and warned him to leave plaintiff alone. The conversation was recorded and later played at trial for the judge. The mother told defendant it was "one last call to let him know that we were going to take legal action if he continued to make more advances with [plaintiff]."

Later that month, on December 29, 2023, an in-person incident occurred at the place where the parties both worked. Plaintiff testified that, as she was

3

leaving her shift, she and defendant saw one another in the lobby but she kept walking.  She further elaborated:

> He turned around.  He had a bag in his hand, and he started saying my name.  I said very loudly, don't talk to me, don't talk to me, don't talk to me.  He proceeded to follow me and kept trying to talk to me.
>
> Eventually he disappeared at that point, and I thought I was safe a little bit.  By then, I was already at the garage link heading to my car.  I immediately called my best friend so that way I had somebody on the phone with me as I went to my car for safety.  When I got in my car, we're talking about it, she's asking me how I'm doing, and I just was like in shock.  And I'm just like I don't—I don't know really how to feel about this.  This is really embarrassing that there's people now asking me, you know, are you okay as I'm walking out of the [building].
>
> After that, I swiped my badge to get out of the garage, and he was standing there at the stop sign waiting for me, expecting me to stop at that stop sign.  I just rolled right through it.
>
> . . . .
>
> He just kind of looked at me desperately and then he texted me afterwards.

Plaintiff testified this encounter was "really concerning" because defendant was approaching her in public, at her place of work, and this encounter caused her to feel "really isolated."  Later that day, defendant texted her again.

A-3044-23

More unwanted contacts continued into the new year. On January 16, 2024, plaintiff was contacted by a mechanic that defendant had recommended to her. The mechanic stated that defendant "was trying to pay off the debt [plaintiff] had owed [the mechanic]." Plaintiff called the mechanic and informed him that she did not want any help from defendant.

Then, on January 18, 2024, defendant again texted plaintiff, pleading to hear her voice again. In that text, defendant wrote: "I'll leave you alone for a[]while . . . Hearing your voice is literally all [I] need."

A few days later, plaintiff received another text from defendant via a new phone number. The text said: "Happy birthday, [plaintiff]. Today is an important day for you because it is a day that you thought that you would have never made it to but you did." Plaintiff explained to the court that defendant was referring to her history of depression and mental health issues. She divulged to the court she "almost killed [her]self two years prior" on her birthday. This was the final text before plaintiff made the decision to obtain a temporary restraining order ("TRO") that same night.

Plaintiff explained that:

> [A]t that point, it was really clear, especially since he was now telling me that I had pretty much until I graduated to heal and accept him back with open arms, that this wasn't going to end. It didn't matter if I change

5

my number. It didn't matter if I even moved, because honestly, he still knew where my mother lived. At this point . . . he was already warned that law [enforcement] will need to be involved going forward. The fact that [he] texted me all day throughout my birthday and then felt the need to text me at night at 11:18 p.m., being the last person that I spoke to, or would hear from, on my birthday, it just shows that all of this is an emotional power play, and that nothing was going to end if I didn't get higher people involved. It's a very scary thing to feel. It's really traumatizing to be constantly reminded of everything that I've been through in the past, of the people that I've lost along my journey in life, you know.

The Family Part issued a TRO, which was duly served on defendant. The complaint accompanying the TRO specified several of the above incidents of alleged harassment. Both parties retained counsel and appeared for trial.

The sole witness at trial was plaintiff, who was extensively questioned by the court and counsel. At the conclusion of plaintiff's testimony, defense counsel argued that plaintiff had failed to prove any predicate act of harassment, nor established the need for restraints under the PDVA. Defense counsel emphasized there was no physical contact with plaintiff. Counsel characterized the communications as benign efforts of defendant to "profess his love" for plaintiff. He argued there was no basis for plaintiff to feel threatened by defendant.

6

In his oral opinion, the judge soundly rejected these defense arguments, finding that, by a preponderance of the evidence, plaintiff had established both the predicate act of harassment and the need for restraints, as required under the two-prong test of Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). As the judge elaborated:

> The [c]ourt finds . . . that the plaintiff has proven by a preponderance of the evidence, the predicate act of harassment[.] . . . [D]efendant has a way of . . . throwing in there sensitive points and sensitive issues. The father's passing, the brother's passing, the contention that the wrong parent died . . . really cruel kinds of things to say. He understands . . . the plaintiff has some trauma in her life. Well, he uses that, too. He uses that all designed to rekindle this relationship which I don't think . . . was ever going to happen in any event. He, again, uses these things against her in order to make her come back.
>
> . . . [I]n terms of harassment, I find that that has been proven[.] . . . I have multiple text messages. I have third party inquiries. I agree that . . . it's harassing when the plaintiff says I don't want to have a relationship with you any more and then she's getting text messages from third parties. . . . [I]t's harassing when you start using other numbers, when you're getting blocked and you use other numbers to make your contact.
>
> . . . .
>
> But what he chose to do was conduct himself in a harassing manner all to try to . . . get in the plaintiff's head[.]

A-3044-23

[(Emphasis added).]

The judge went on to explain why he found the element of the necessity of restraints had also been proven. He considered the letters defendant sent to plaintiff and found that those letters were "very scary for somebody like the plaintiff who is really seeking to distance herself from him." The judge found that "she is scared, and I understand. She should be scared, because he indicated that [in] no way was it ever going to stop." The judge went on further:

> How do we stop the conduct of the defendant? It's got to be done, and this is why the domestic violence law exists . . . to impose a law that says . . . if you have contact any more with plaintiff, then . . . it's going to be a criminal violation. [T]he defendant had multiple, multiple opportunities to walk away. I can't imagine anything that I've heard and anything that I've read here would indicate that . . . the plaintiff had any interest in continuing a relationship with him.
>
> . . . .
>
> Once a predicate act has been found, it needs to be determined whether there is a continuing need for a protective order in the form of a final restraining order . . . finding that the defendant will not stop contacting the plaintiff, refuses to accept the fact that the relationship is over, clearly, this is of great concern. The plaintiff has a genuine fear of what he would do. He talks about coffins. He talks about killing. He talks about doing anything and everything he can to rekindle the relationship. He talks about the parties being buried in the same grave. . . . So that is really, really troubling, and certainly supports the second prong of Silver to say

that . . . the plaintiff is in danger, in my opinion, if this final restraining order isn't issued.

Defendant appeals, essentially renewing his arguments that plaintiff failed to establish the two prongs of Silver by a preponderance of the evidence.

In assessing these arguments, our scope of review is limited. In reviewing an FRO issued by the Family Part following a trial, the Family Part's findings are binding "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). This court "defer[s] to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412); see also S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010).

The applicable substantive law is well settled and can be succinctly stated. The entry of an FRO requires the trial court to undertake a two-step analysis. Silver, 387 N.J. Super. at 125-27. The first step requires the court to "determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should consider "the previous history of violence between the parties." Ibid.

9

The PDVA identifies harassment as one of the predicate offenses that may support a finding of domestic violence and the issuance of an FRO. N.J.S.A. 2C:25-19(a)(13).

In the Criminal Code, harassment is defined to include conduct in which a defendant, "with purpose to harass another[,] . . . [m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm." N.J.S.A. 2C:33-4(a) (emphasis added); see also J.D. v. M.D.F., 207 N.J. 458, 477 (2011). Annoyance is understood to mean "to disturb, irritate, or bother." Ibid. Alternatively, harassment is defined as conduct in which a defendant "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(c) (emphasis added).

A defendant commits harassment when "act[ing] with the purpose of harassing the victim." D.M.R. v. M.K.G., 467 N.J. Super. 308, 323 (App. Div. 2021) (emphasis added). "'A finding of purpose to harass may be inferred from the evidence presented' and from common sense and experience." Ibid. (quoting H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003)). "Although a purpose to harass can be inferred from a history between the parties, that finding must be supported

by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487. A judge must consider "the totality of the circumstances to determine whether the harassment statute has been violated." H.E.S., 175 N.J. at 326 (quoting Cesare, 154 N.J. at 404). A single harassing communication may suffice under the Act. State v. Hoffman, 149 N.J. 564, 580 (1997) (emphasis added); see also C.C. v. J.A.H., 463 N.J. Super. 419, 434-35 (App. Div. 2020).

The trial court had more than ample grounds to find defendant committed multiple acts of harassment of plaintiff after their dating relationship ended. We adopt Judge Bernardin's well-supported findings on this first prong. The persisting unwanted communications by defendant, after being firmly told by plaintiff to cease them, were manifestly intended to "cause annoyance or alarm." N.J.S.A. 2C:33-4(a). Although defendant professed benign intentions, his actual words and conduct easily support an inference that he intentionally wanted to cause plaintiff to be upset and alarmed. We have nothing to add to the judge's astute observations.

As for the second prong of Silver, the judge also had more than sufficient evidence to support a finding of a future need for restraints. The judge found

plaintiff credibly testified why she was fearful of defendant and needed the law's protection. Again, we incorporate by reference the judge's analysis.

In sum, there is no basis to set aside the judge's well-reasoned and evidentially supported determinations.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-3044-23