# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1475-24

O.H.,[1]

    Plaintiff-Respondent,

v.

T.E.H.,

    Defendant-Appellant.

_____

Submitted January 13, 2026 – Decided March 19, 2026

Before Judges Rose and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-0556-25.

Sherman, Silverstein, Kohl, Rose & Podolsky, PA, attorneys for appellant (Kristofer B. Chiesa, on the briefs).

Einhorn, Barbarito, Frost, Botwinick, Nunn & Musmanno, PC, attorneys for respondent (Matheu D. Nunn and Jessie M. Mills, on the brief).

---

[1] We use initials to protect the parties' privacy. R. 1:38- 3(d)(12).

PER CURIAM

Defendant T.E.H. appeals from a December 13, 2024 final restraining order (FRO) entered against her and in favor of plaintiff O.H. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Because we conclude the Family Part issued the FRO based upon predicate offenses not identified in the domestic violence complaint without sufficient notice to defendant, we vacate and remand for a new hearing in accordance with this decision.

I.

A. The Temporary Restraining Orders

The parties were in the throes of a contentious divorce when plaintiff obtained a temporary restraining order (TRO) against defendant on August 11, 2024. The TRO alleged, on August 11, 2024, "defendant did endanger plaintiff's life, health or well[-]being," claiming, "defendant threatened physical harm to . . . plaintiff by unknown means." Plaintiff identified only "terroristic threats" as the predicate offense, and under "prior history of domestic violence," the TRO stated only: "Multiple documented incidents which police responded to."

On August 20, 2024, plaintiff amended his TRO. The amended TRO again indicated a predicate offense of terroristic threats, and again alleged "defendant did endanger plaintiff's life, health or well[-]being" on August 11, 2024 when

2

"defendant threatened physical harm to . . . plaintiff by unknown means."

However, the amended TRO included the following details:

> I am the plaintiff in the above matter, and I am requesting to only amend my complaint for a domestic violence restraining order dated 08/11/2024 to include the below:
>
> I would like to provide additional information about the act of domestic violence described in the original complaint. The information is provided here:
>
> On or about August 12[], 2024[,] . . . defendant and her mother who is her supervisor came to pick up our children from the marital home, and against the consent order she walked into the garage picking up items while I was not home without her mother coordinating the time and date with me first. . . . Defendan[t']s behavior is stressful to the children.
>
> On or about August 5[], 2024[,] defendant's mother messaged my partner on LinkedIn in a harassing manner. On July 3[], 2024[,] defendant reached out to my partner's former husband, and has researche[d] my partner, seemingly all to obtain information, which is particularly alarming given her history of vandalism of my vehicle and her mental health concerns.
>
> On or about July 28[], 2024, . . . defendant returned our children with her mom, who is her supervisor, [twenty-five] min[utes] after the return time. . . . Defendant entered the marital hom[e']s garage and started taking photos. I repeatedly asked her to leave, she refused and continued taking photos. I asked defendan[t']s mother if she was supervising, to which she responded, in front of the children do[n']t talk to me, you cheate[r].

A-1475-24

On or about July 25[], 2024[,] on a cam*s[2] BBQ event, . . . defendant showed up with her mother and sat down at the same table I sat with our children. I left the table and walked away. When it was time to leave at 7 [p.m.], I reached for our so[n']s hand and . . . defendant aggressively pushed my hand away.

Defendan[t']s actions have caused stress and anxiety to both me and our children, including at parenting exchanges.

Under "prior history of domestic violence," the amended TRO listed the following additional acts:

Multiple documented incidents which police responded to.

In the past, . . . defendant committed the following additional act(s) of domestic violence that was either reported or unreported to law enforcement and was not included in my original complaint:

A. May 28[], 2024 there was an event at our kid['s] school. Before she left the event, defendant vandalized my car in the parking lot. Defendan[t']s actions caused damage exceeding $1[,]700.

B. May 14[], 2024 - defendant was hospitalized on May 12[], 2024 for self-harm. After she was released, . . . defendant returned back to the marital home while me and my [twelve-year-old child] were there. Defendant screamed and cursed at me as well as punched me in chest and kicked me multiple times. Defendant reached for a knife during the incident.

---

[2] We include this text verbatim, but note the meaning of "cam*s" is unclear.

A-1475-24

C.  On or about Oct[ober] 16[] 2023, . . . defendant threw my personal belongings outside the house in front of our children while cursing at me and making threats like this is going to be a World War III.  If you think what the Hamas did to Israel was bad, wait until you see what I will do to yo[u].

D.  In or about March 2023, defendant held a knife to her stomach and said is this what you want me to do.  I moved toward her and she turned the knife toward me.

Defendant has a history of mental health treatment through 2024.

B.  The FRO Hearing

One month later, the trial court held a hearing during which plaintiff and two police officers testified.

1.  Prior History

Before testimony commenced, the court defined plaintiff's allegations and the parameters of the hearing.  The court first read the language of the initial and amended TROs, noting, "these are prepared generally by law enforcement." The court added, "So it sometimes includes everything; sometimes it doesn't include everything; sometimes it's correct; sometimes it's not correct." Indicating "the . . . proof" would be "the testimony," the court noted it read the allegations "just to begin to frame the issue."

5

The court then clarified plaintiff's "contention is fairly straightforward. That on August 11, 2024 at 8:25 p.m., the [TRO] reads, 'Defendant threatened physical harm to plaintiff by unknown means.'" As the court read the amended TRO, it distinguished between the alleged facts underpinning the predicate terroristic threats offense, and those constituting allegations of past acts of domestic violence.

A review of the hearing record demonstrates defendant repeatedly objected to plaintiff's broad reliance on testimony regarding defendant's past instances of conduct and mental health history, asserting the alleged past conduct, while relevant for context, could not substitute for evidence of a new and independent predicate act. Notably, at the outset of plaintiff's testimony regarding certain prior acts of alleged domestic violence by defendant, including allegations from October 2023 regarding defendant's threatening plaintiff and throwing his possessions in the garbage and on the front lawn, defendant moved to bifurcate the proceeding to avoid blurring lines between new allegations and prior conduct.

Although defense counsel acknowledged the prior history generally was relevant to the FRO proceedings, counsel expressed concern the history had

6

become the focus of the hearing, particularly in view of defendant's mental health history.

The trial court denied defendant's motion, reasoning testimony regarding prior acts of domestic violence need not be limited. The court clarified it could "consider these past acts relative to the contentions that bring us here, or [that] brought this TRO about."

Plaintiff then testified concerning defendant's prior conduct. He described and played a video recording of an October 2023 argument during which defendant threw plaintiff's clothes on the front lawn. A separate recording captured plaintiff warning defendant not to "touch [his] stuff," and defendant responding, "this has now become World War III. You think it's bad in Israel with Hamas, I am going to be way worse than Hamas." Plaintiff testified he believed defendant's statement was "a threat." He explained his concern because "since [they] started the divorce, and even before that, . . . [defendant] became more aggressive."

Plaintiff testified, months earlier in March 2023, he told defendant he would like to "proceed with the divorce" just as his children were "about to leave for school." He claimed "[defendant] walked into the room with a sharp knife, lift[ed] her shirt up, and put the blade on her stomach. . . . And [she] said to

[him], 'Is this what you want me to do?'" Plaintiff testified, "when [he] tried to stop her, she raised the knife against [him]." Plaintiff described taking "three steps back" and pleading with defendant not to "do it" because the kids were nearby, at which point defendant left the room. Plaintiff testified defendant again threatened him with a knife almost one year after the March 2023 incident, causing him to obtain the October 2023 TRO. However, plaintiff later conceded he did not allege defendant threatened him with a knife in that TRO. Plaintiff testified on various occasions, when the topic of divorce was mentioned, defendant reacted by "threatening to hurt herself," "bang[ing] her head on the wall in the master bedroom," or "punch[ing] the wall in the laundry room."

Defendant again objected to plaintiff's testifying concerning past conduct including defendant's past threats of self-harm, arguing, "[t]he issue is what occurred between these parties[,] [a]nd any conduct, acts of domestic violence . . . prior acts of domestic violence to [plaintiff]." The court overruled this objection and allowed the testimony, noting, "threat of self-harm is an element, potentially, of domestic violence. So I need to hear about it."

Regarding plaintiff's detailed testimony about defendant's mental health diagnoses over defendant's objection, the trial court noted, "I can filter [that] out . . . . I certainly am not considering [plaintiff] an expert. I'm certainly not

considering a diagnosis or being bound by anything." Plaintiff then testified defendant had previously been diagnosed as bipolar and schizophrenic.

Plaintiff also testified he dismissed the October 2023 TRO against defendant because he "wanted [defendant] . . . to get better, to take care of herself, to take care of her mental health." He admitted defendant had obtained a TRO against him at the time as well. Plaintiff indicated "[t]hings have gotten worse," and testified he lives in fear because he "doesn't know what [defendant is] capable of doing."

Plaintiff described a May 2024 incident when plaintiff dropped the children off, and defendant raised a dispute regarding child support. He claimed he told defendant to "leave it to the attorneys," but defendant became aggressive and threatened he would not see his children anymore. He then presented a text message from defendant in which she claimed as a result of his cheating she was "crushed" and "[could] not be a part of this world any longer where everything [plaintiff did was] to break [her] down until there is nothing left [of her]." He claimed he notified defendant's mother and went to their home to be with the children where he found her "heavily medicated" with a "bottle of pills that w[as] laying next to her." Plaintiff testified police arrived and "took her to a mental institut[ion]."

9

Plaintiff also presented testimony from the responding police officer, who testified defendant made "suicidal statements." The officer explained police determined defendant required crisis evaluation and recounted defendant's stating, "I am not suicidal; I'm homicidal. If that's what you want to know. I want to murder him. Okay. I want him to get the hell out of my life and stay away from me and the kids." The officer testified defendant, while in the ambulance and out of plaintiff's presence, made additional statements including: "I threatened to cut my ex-husband's throat," "I hope my ex-husband gets shipped back to Israel and gets blown to a million pieces by Hamas," and "[w]hen I get out, I'm going to overdose on pills."

When plaintiff testified, he acknowledged defendant accused him of assaulting her. He denied causing bruising on defendant's wrists, instead suggesting the bruising resulted from police restraints when transporting her for evaluation.

Plaintiff explained, while defendant was hospitalized, plaintiff secured an emergent order suspending defendant's parenting time with the children. Two days after her release, according to plaintiff, defendant entered the marital home and "punched" and "kicked" him. Plaintiff explained, although he did not include the allegation in the TRO, he and defendant moved to the kitchen, where

10

defendant "reached her hand to grab the knife behind [him]." Plaintiff claimed he then left the home as defendant cried. Plaintiff played a video recording allegedly capturing the incident.

Plaintiff testified about a prior incident in May of 2024 when the parties were present at the children's school. He claimed upon leaving the school he found his car had been "keyed" leaving a scratch. He played a video recording from the parking lot and identified what he alleged to be defendant reaching an arm out while passing plaintiff's car. Plaintiff explained criminal charges related to this incident were dismissed after he failed to appear for the court date.

## 2. Defendant's Alleged Conduct in July through August 2024

Relevant to the discrete time period plaintiff alleged for the predicate act of terroristic threats, plaintiff testified the parties had entered a consent order in June 2024. The agreement provided plaintiff "temporary exclusive possession of the marital residence" and allowed for the transfer of the children between the parties at the home. The consent order did not prohibit contact between the parties. Plaintiff explained he entered the agreement because he was "in fear . . . that [defendant] c[ould] attack [him] again." The consent order provided defendant's time with the children be supervised by either defendant's parents or her brother.

11

According to plaintiff, during this period, defendant sent an email to his therapist and a Facebook message to his partner's ex-husband. Plaintiff asserted defendant used the name of his prior girlfriend in the email which plaintiff's therapist forwarded to him. Plaintiff postured his prior girlfriend never would have sent the message. The content of the message inquired if the therapist specialized in treating clients "who deny they are narcissists," "refuse to pay child support or alimony to his wife of seventeen years," and "spend $50,000 on international vacations." Plaintiff indicated his therapist forwarded the message to alert him of the communication.

Plaintiff testified his partner received a message purportedly from defendant's mother via LinkedIn, but plaintiff alleged defendant actually sent the message. The message pertained to plaintiff, his failure to pay child support or alimony, his infidelity, and some of his financial information. Plaintiff also testified regarding an anonymous post in August to a Facebook group called "The Israeli Cherry Hill Community," referencing specific details of the divorce and plaintiff's infidelity, and "badmouthing" him.

Plaintiff further claimed, in July of 2024, "[defendant] walked into the garage" of the marital home, while defendant's mother waited in a car. Plaintiff indicated defendant was "taking pictures . . . inside the garage," and plaintiff

threatened to call the police if defendant remained in the garage. Plaintiff explained that, shortly after this incident, two police officers appeared at his house because defendant claimed plaintiff assaulted her, and asked plaintiff if he "attacked [defendant]" or "talked badly to her," which he denied.

According to plaintiff, the parties attended a barbecue on July 25, 2024. Plaintiff indicated he stayed away from defendant, but when he began to leave with the children, defendant was hugging their son. Plaintiff described approaching defendant and their son and claimed defendant "pushed [his] hands away aggressively."

Plaintiff admitted another judge, on August 6, denied plaintiff's emergent application in the divorce matter seeking exclusive possession of the marital home and to bar "exchanges" between the parties. Plaintiff then sought and obtained the initial TRO five days later. Plaintiff testified defendant entered the marital home the next day, when plaintiff was admittedly not at home. Plaintiff presented a video recording showing defendant's car and defendant "briskly" approaching the home. Plaintiff explained defendant entered the garage and began "removing" items from the house. He testified defendant came to the home when he was not there, but the children were home with the nanny.

13

Plaintiff testified he feared defendant. He explained he believed he needed protection as defendant "can kill [him]." He explained his fear is based on defendant's past threats and "all the elusive incidents, of [defendant] contacting . . . [his] partner, [his] partner's ex-husband, [and his] therapist."

### 3. Defendant's Motion to Dismiss

Defendant moved to dismiss the complaint at the close of plaintiff's case. She asserted plaintiff failed to prove the singular predicate act of terroristic threats alleged in the complaint, and thus, under Silver, failed to establish the essential first requirement for entry of an FRO.

Defense counsel again argued plaintiff could not seek to rely upon prior threats to cure his lack of proof of any alleged terroristic threat within the period alleged in plaintiff's complaint. Specifically, counsel asserted:

> [T]his domestic violence complaint alleges a single predicate act of terroristic threats. The TRO lays out in the section about the predicate acts, Judge, the dates we're dealing with. And those dates are in essence July 25[] up through August 11[]. Everything else, and Judge, admittedly there was quite a bit of focus about what is prior history in this case. The May . . . allegations, the October allegations, that's all prior history as alleged in this complaint. But with respect to the sole predicate act of terroristic threats, it's our position, Judge, that there is not a single iota of evidence that one threat was made during any of the dates alleged in the domestic violence complaint.

14

Addressing the facts alleged in support of the terroristic threats allegation, defense counsel argued:

> [T]here is no predicate act. What is happening here is that . . . plaintiff is trying to take a single incident, the one thing that he can grab onto from months ago and turn it into something that it is not. But what we can't do Judge, is we can't go back and essentially create . . . a predicate act where there isn't one.

Although acknowledging plaintiff's complaint contained a "blanket statement that he felt a threat of physical harm," the court denied the motion to dismiss. The court also noted plaintiff's "references again to numerous past incidence of domestic violence," stating these past acts such as "the May 28[] car scratching incident, [and] the May 14 hospitalization of the defendant as a result of allegations of threats of self-harm" were offered to show defendant's conduct "leading up to the request on August 11." The court summarized plaintiff's argument he established "the consent order was violated when defendant entered the garage," "[defendant messaged] plaintiff's partner in a harassing manner" and "contact[ed] plaintiff's partner's ex in a harassing manner; not necessarily harassing toward those persons themselves, but with intention to, I guess, harass plaintiff."

Citing H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003), the court recognized, "'the parties' history, when properly presented, helps to inform the court

15

regarding defendant's purpose, motive, and intentions, or intended use of particular information' in that case."

Referencing the parties' divorce, the court noted "there are certainly contretemps here." The court then framed "the question" as "whether those allegations amount to the contentions of, again, harassment or terroristic threats." The court noted there were also "complaints about the history of mental illness; . . . contentions of a use of a knife, turning the knife toward plaintiff." Recognizing the "low bar" standard for motions to dismiss, and indicating it addressed "the court's use of the current complaints versus the past contentions," the court denied the motion.

4. Arguments and Court's Decision

Defendant did not present witnesses or evidence and, after the court admitted the electronic messages and social media posts over defendant's objection, arguments followed. Defense counsel argued plaintiff failed to meet its burden to establish the predicate offense of terroristic threats. Counsel asserted plaintiff's amended TRO alleged specific dates and acts for the predicate acts and argued plaintiff presented "no evidence of terroristic threats on any single one of those dates." Defendant's counsel argued, "What . . . plaintiff is attempting to do here, Judge, knowing that they don't have

16

any evidence of terroristic threats as a predicate act, is they're trying to backfill their case." As to the May incident when defendant was hospitalized, counsel argued "[t]hat's prior history. It's not a predicate act."

After defense counsel's closing argument, the court asked, "The restraining order checks off a box, there's terroristic threats. Does that limit me?" Defense counsel argued plaintiff was required to amend, and never amended, the restraining order to include additional predicate acts. Defendant's counsel then speculated, "I think probably what Your Honor is getting to is . . . whether harassment can be considered here. And . . . my position is that it can't." Plaintiff's counsel responded, "procedurally, Your Honor, you absolutely can, if you hear testimony that rises to the level of any of the other boxes, right, you absolutely can choose harassment." The court replied it "believe[d] that[ was] true."

The court then immediately rendered its oral decision, finding "numerous predicate acts were laid out," including defendant placing plaintiff's belongings in trash bags and throwing them on the lawn, "defendant threaten[ing] herself with a knife" and "wield[ing] a knife at [plaintiff]," and threatening to "slit . . . [p]laintiff's throat." The court also cited the May incident when defendant was hospitalized after threatening suicide, and her statement to police

17

that "it's not suicide, it's homicide."  Based on those events, the court concluded "there were threats from [defendant] to kill [plaintiff]."  The court also referenced as predicate acts, "[d]efendant disparaging [plaintiff] on social media" and "contacting . . . [p]laintiff's current paramour."  The court also cited the school parking lot incident as a predicate act, concluding that "[d]efendant, wife, damaged . . . [p]laintiff's vehicle."

The court then stated, "The [TRO], I guess even as amended . . . provides for certain boxes under the question, . . . 'which constitutes the following criminal offenses, check all applicable boxes.'"  The court noted,

> the box that's checked is "terroristic threats" and not other potential predicate acts.  The issue for the court is, does that limit . . . plaintiff in the allegations and what might be predicate acts and what predicate criminal code charges would be involved?  I specifically find, no.  I think as I stated previously, these matters are prepared by law enforcement officers, generally, and not, certainly, the parties themselves, nor the attorneys, nor even the judge that's issuing it.  So, I do not find that I am limited in the context of a final restraining order hearing in determining the conduct and what might appropriately apply to any particular predicate act.

The court then found plaintiff sufficiently proved three predicate offenses—harassment, criminal mischief, and terroristic threats.

As to harassment, the court found "plaintiff testified credibly" and identified the following "acts of contended harassment":

> [T]he bags on the lawn; the knife on the stomach; the threat to slit the throat; the upsetness exhibited when defendant was released from the hospital; . . . the disparaging nature of the social media posts; the punching a hole in the laundry room wall; the banging the head; the comments of threats to harm and kill . . . plaintiff; stating that she was going to do things worse than Hamas did to Israel; that she wielded a knife, she was threatening herself with the knife. . . . [C]ontentions of . . . cursing and yelling; again, could very well be contretemps. However, there is credible testimony that . . . defendant punched . . . plaintiff in the chest and that there were signs of injury.

The court "f[ou]nd that defendant made communications to . . . plaintiff in a manner likely to cause annoyance or alarm." The court also found defendant "violated . . . the consent order when she went to the house, went into the garage, [and] was taking pictures" because "[t]he consent order gave exclusive possession of the property to . . . plaintiff."

Regarding terroristic threats, the court noted, "the terroristic threats really relate to the wielding of the knife" because "there was a threat to kill another with the purpose to put him in imminent fear of death under the circumstances reasonably causing the victim to believe the immediacy of the threat and likelihood that it would be carried out." The court also found plaintiff credible

in his belief in the immediacy of the threat because "plaintiff[] testified that he had to lock the door" out of fear of "defendant entering and doing [him] harm." Accordingly, the court found plaintiff proved "a violation of the terroristic threats criminal statute." Citing "[t]he instances with the police officers," the court noted, while the threat made in the ambulance "wasn't a threat made directly to . . . plaintiff, . . . it [wa]s evidence of the intent . . . of . . . defendant." In addition, the court indicated there were still "threats of death made directly to . . . plaintiff."

As to criminal mischief, the court found "in purposely damaging [plaintiff's] car, . . . defendant committed criminal mischief."

After finding three predicate acts, the court then addressed the necessity of a permanent restraining order. The court considered all relevant factors and questioned "whether there is escalating conduct" or "difficulties between the parties," and found both. The court also acknowledged "a substantial history of domestic violence between the parties" and "prior [TROs] making allegations, individually or by each against the other of domestic violence." The court concluded defendant had "an intent to harm [plaintiff]" and found "an existence of immediate danger . . . to person or property," necessitating an FRO.

20

II.

A.

On appeal, defendant argues the trial court improperly entered the FRO based on predicate acts neither alleged in the complaint nor proven and, instead, impermissibly relied on past alleged acts of domestic violence in finding predicate acts. Defendant also contends the court erred in denying her motion to dismiss because plaintiff failed to prove the single predicate offense alleged in the complaint—terroristic threats. Plaintiff counters the court correctly based its findings, specifically as to the predicate act of harassment, on the "course of alarming conduct" in this case. Although conceding the complaint did not allege harassment as a predicate act, plaintiff contends the court found harassment based on defendant's violation of the consent order and contacting plaintiff's partner and therapist, all of which was included in the narrative of the predicate acts section of the amended TRO.

B.

Our review of a trial court's grant of an FRO is limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). Indeed, its findings "are binding . . . when supported by adequate, substantial, credible evidence."

<u>Cesare v. Cesare</u>, 154 N.J. 394, 412 (1998). This court reviews legal conclusions de novo. <u>T.B. v. I.W.</u>, 479 N.J. Super. 404, 412 (App. Div. 2024).

When determining whether to issue an FRO pursuant to the PDVA, courts must engage in a two-step analysis. <u>See</u> <u>Silver</u>, 387 N.J. Super. at 125-27. First, the court must determine "whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." <u>Id.</u> at 125. Second, upon finding a predicate act of domestic violence, the court must then determine whether an FRO is required to protect the party seeking restraints from future acts or threats of violence. <u>Id.</u> at 126-27. "[T]here [must] be a finding that 'relief is necessary to prevent further abuse.'" <u>J.D. v. M.D.F.</u>, 207 N.J. 458, 476 (2011) (quoting N.J.S.A. 2C:25-29(b)).

Due process and notice concerns extend to PDVA matters requiring "notice defining the issues and an adequate opportunity to prepare and respond." <u>H.E.S.</u>, 175 N.J. at 321 (quoting <u>McKeown-Brand v. Trump Castle Hotel & Casino</u>, 132 N.J. 546, 559 (1993)). To be sure, "[t]here can be no adequate preparation where the notice does not reasonably apprise the party of the charges, where the issues litigated at the hearing differ substantially from those outlined in the notice." <u>Id.</u> at 322 (alteration in original) (quoting <u>Nicoletta v.</u>

22

N. Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 162 (1978)). PDVA defendants must be afforded a "meaningful opportunity to defend against a complaint in domestic violence matters." D.N. v. K.M., 429 N.J. Super. 592, 606 (App. Div. 2013).

Although allegations need not be meticulously exact, they must be specific enough to provide defendants with meaningful notice of the claims against them, and a finding of domestic violence must be based upon the act or acts alleged in the complaint. See H.E.S., 175 N.J. at 324-25. "[I]t constitutes a fundamental violation of due process to convert a hearing on a complaint alleging one act of domestic violence into a hearing on other acts of domestic violence which are not even alleged in the complaint." Id. at 325 (quoting J.F. v. B.K., 308 N.J. Super. 387, 391-92 (App. Div. 1998)).

Importantly, to ensure liberal protection is afforded to domestic violence victims seeking relief under the PDVA, courts afford plaintiffs ample latitude to supplement and amend the allegations set forth in the original PDVA complaints. See J.D., 207 N.J. at 478-79. However, "[t]hat reality is not inconsistent with affording defendants the protections of due process to which they are entitled." Id. at 479. "[E]nsuring that defendants are not deprived of their due process rights requires our trial courts to recognize both what those

rights are and how they can be protected consistent with the protective goals of the Act." Ibid.

Thus, a court permitting expansion of the allegations in the complaint "must recognize . . . it has permitted an amendment to the complaint and must proceed accordingly." Id. at 479-80. Our review of the record does not persuade us the court provided adequate notice to defendant it had functionally amended the complaint to now include two additional predicate acts, harassment and criminal mischief, or that it would rely upon threats, previously identified as past acts of domestic violence, to anchor its finding defendant committed the predicate act of terroristic threats.

As detailed, defendant raised a nearly standing objection to the court's conflating prior alleged acts of domestic violence with the singular allegation that, in the discrete period between July 25 and August 11, 2024, defendant committed an act of terroristic threats. Although the court repeatedly responded to motions and objections by appearing to clarify it would confine its consideration of prior acts to contextualizing the new terroristic threats allegation in the complaint and to determine the need for permanent restraints, acts consistently defined as past conduct permeated the court's findings as to each of the three predicate acts it found. Although we recognize we need only

24

find plaintiff proved one predicate act to meet the first requirement under <u>Silver</u>, 387 N.J. Super. at 125 (noting courts need only find a single predicate act has occurred), the court's terroristic threats finding cannot ground the FRO because the court itemized and relied exclusively upon multiple past incidents to support its finding. Likewise, the court's harassment findings were laden with instances of past conduct.

Cognizant that PDVA complaints are not drafted with surgical precision, and recognizing amendments to those original pleadings are fluid and should be liberally granted when necessary, we nonetheless cannot agree the vital and delicate balance of the PDVA victim's and defendant's rights was properly struck in these circumstances. The precise predicate acts and prior acts were never sufficiently defined, creating, however unintentionally, the possible impression the past acts outlined in plaintiff's complaint and in the testimony would serve only to color the predicate acts and to determine whether future restraints were warranted to ameliorate risk of further domestic violence.

Accordingly, we vacate the FRO, reinstate the TRO, and remand for a new hearing to be conducted after any amendments are carefully defined so defendant understands the precise allegations against her and plaintiff can meaningfully prepare to fulfill his burden. As the trial court made explicit

25

credibility findings, we direct this matter be heard by a different judge on remand. See J.L. v. J.F., 317 N.J. Super. 418, 438 (App. Div. 1999) (directing a different judge conduct a plenary hearing on remand as "the [original] judge determined plaintiffs' position was not credible," noting, "this reflects a policy of the courts, and not on the professional manner in which this matter was handled" by the court). Further, as we vacate the FRO on independent grounds, we need not reach defendant's additional arguments.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-1475-24